# THE UMBRIA.[1]

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 23.   Argued March 27, 30, 1896; March 2, 3, 1897. — Decided April 5, 1897.

The Umbria, a passenger steamer carrying the mails, coming out from the harbor of New York at full speed about midday in a fog which was at times dense and at times intermittent, collided with the Iberia about eleven miles from the entrance to the harbor and sank her. *Held*, that the Umbria was gravely at fault in the matter of speed, and that this fault was not lessened by the fact that passenger steamers carrying the mails run at full speed in a fog in order to pass the foggy belt.

Accepting, in the absence of other evidence, the testimony of the officers and crew of the Iberia as conclusive, the court, while of opinion that it would have been more prudent not to have changed her course in manner as set forth in the Statement of the Case, is unwilling to say that the doing so was necessarily a fault on her part.

The general consensus of opinion in this country is that in a fog a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law.

The damages should not have been divided by the court below. The majority of this court think that the Iberia was not in fault under the circumstances set forth in the statement of the case, and the other members of the court are of opinion that her fault, if any, did not contribute to the collision.

In cases of total loss estimated profits of a charter party not yet entered upon are always rejected; and there is nothing in the facts to take this case out of the general rule.

----

[1] The docket title of this case is: *The Cunard Steamship Company (limited) owner of the Steamship Umbria* v. *Cyprien Fabre, Manager of the Compagnie Française de Navigation à vapeur.*

THIS was a suit in admiralty, brought in the District Court for the Eastern District of New York, by the owners of the French steamship Iberia against the British steamship Umbria, to recover damages for a collision, which took place about a quarter past one in the afternoon of November 10, 1888, in a dense fog off the coast of Long Island, about eleven miles from the entrance to New York harbor, and six miles south of Rockaway Beach.

The Iberia was a French steamship 240 feet long, of 1059 tons register, capable of a speed of from $9\frac{1}{2}$ to 10 knots an hour, was laden with a valuable cargo, and bound from the Red Sea and Mediterranean ports to New York. She had been in a fog since 8 o'clock in the morning, was running with her engines "easy," the lowest order short of stopping, at a speed of $3\frac{1}{2}$ to 4 knots an hour on a W.N.W. course, and making occasional soundings with her lead. On two occasions, within a half hour preceding the collision, she had heard the whistle of an approaching steamer a little on her port bow, had altered her course two points to the starboard, kept on until the whistles indicated that the steamers were passed, and then returned to her former course. About a quarter of an hour after passing the last of these steamers she heard a whistle which proved to be that of the Umbria, bearing about two points on her port bow. Immediately, as on the previous occasions, her head was put two points more to starboard, a short whistle was blown, her helm was steadied upon a N.W. course, and held so. While so proceeding, after four or five minutes, several more of the Umbria's whistles were heard, all bearing about the same direction from the Iberia (allowing two points for the porting), the sound rapidly increasing in volume. Finally the Umbria herself came into view about 900 feet away, and bearing about five points on her port hand. She then put her engines full speed ahead in an attempt to escape the Umbria by crossing her bow and had nearly passed her, when the Umbria struck her stem on at an angle of about six or seven points, and cut her stern completely off.

The Umbria was a steamship of the Cunard line, 525 feet

long, of 3450 tons register, capable of a speed of 19½ knots an
hour, and was bound upon a voyage from New York to Liver-
pool, laden with a cargo, and having on board a number of
passengers. After passing Sandy Hook and discharging her
pilot, she was put upon a compass course of E. by S. ¾ S.
From half past twelve, when she discharged her pilot at the
outer buoy, until the collision, she was kept at full speed more
or less of the time, as the intermittent character of the fog
permitted, sounding her whistle at intervals of a minute or
two. The French steamship Normandie discharged her pilot
ahead of the Umbria, and proceeded on her course a little
more to the southward than the latter; at times being in
sight of the Umbria and again being concealed by the fog.
Her whistle was heard from time to time on board the Um-
bria and off her starboard quarter, the latter having passed
her before she reached the place of collision. Shortly after
one o'clock the fog thickened, and while the Umbria was run-
ning at full speed, a very faint single blast of a whistle, which
subsequently proved to be from the Iberia, was thought to
be heard on the Umbria's starboard bow, apparently a long
distance off and well to the southward. Upon hearing this
whistle, and at ten minutes past one, her speed was reduced
by order of her master, and attention given toward the direc-
tion of the sound for a repetition of the signal. Shortly after-
wards a second, and, as some say, a third, whistle was heard,
still apparently a long distance off, on the Umbria's starboard
bow, and well to the southward. The master of the Umbria
thereupon determined that the signals which had been heard
were from a steamship approaching on a course parallel to his
own ; and concluding that the Umbria was clear of her, and
that she would probably port her helm to avoid the Norman-
die, ordered her engines full speed ahead at eleven minutes
past one o'clock. Within a minute from the time such order
was given, another whistle was heard closer to the Umbria
and drawing ahead of her, and almost simultaneously the
Iberia loomed in sight, a little on the Umbria's starboard bow,
on a course crossing her own nearly at right angles, and about
twice the Umbria's length away. The Umbria's engines were

immediately reversed at full speed, her helm put hard aport, but before the Iberia had crossed her course the collision ensued. She struck the Iberia on the port side, about thirty feet forward of her stern, cut her completely in two, and passed on out of sight in the fog.

Upon this state of facts the District Court held the Umbria to have been solely in fault for the collision, entered an interlocutory decree, January 13, 1890, to that effect, 40 Fed. Rep. 893, and referred the question of damages to a commissioner, who made a report to which both parties filed exceptions. One of the exceptions taken by the libellant, the owner of the Iberia, was sustained by the court, and in accordance therewith a new report was made and a final decree entered July 3, 1891, for the sum of $147,500.17. Claimant appealed to the Circuit Court of Appeals for the Second Circuit, which rendered a decision by a divided court, sustaining the decree of the District Court as to the fault of the Umbria, but finding the Iberia also to have been in fault; first, because, after hearing the first whistle of the Umbria, she changed her course without knowing the latter's bearing, course or speed; and second, because she violated Article 18 of the International Regulations, by continuing on, when she knew, or ought to have known, that the courses of the two vessels were crossing, and thereby involving risk of collision. 1 U. S. App. 614. The decision of the District Court was also reversed upon the question involved in the exception to the master's report. A rehearing having been refused, libellant applied to this court for a writ of certiorari, which was granted.

The case was argued on the 27th and 30th March, 1896.

*Mr. Frank D. Sturges* and *Mr. Frederic R. Coudert* for the Umbria. *Mr. Edward L. Owen* was on their brief.

*Mr. Robert D. Benedict* for the Iberia.

On the 21st December, 1896, the case was ordered to be restored to the docket for reargument on the question whether the Iberia was in fault. This reargument took place March 2, 3, 1897.

*Mr. Frederic R. Coudert* for the Umbria.

*Mr. Robert D. Benedict* for the Iberia.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

1. That the Umbria was gravely in fault in the matter of speed is too clear for serious argument. She was within twelve miles of one of the most frequented harbors in the world, in the track of vessels bound into and out of this harbor, and was running at a speed of from sixteen to nineteen knots an hour through an intermittent or variable fog, which was sometimes so dense that vessels could not see each other more than one or two lengths off. She had heard at least two whistles from the Iberia, and without waiting definitely to locate her, had ordered her engines full speed ahead within a minute from the time she hove in sight. Her excuse is that the first whistle of the Iberia, which does not seem to have been heard by the master, but was heard by some of the other officers, appeared to be upon the starboard bow, apparently a long distance off; that the second whistle also seemed a long distance off and well to the southward; and the master, supposing they were from a steamer approaching upon a course parallel to his own, concluded that he was clear of her or had shaken her off; that the approaching steamer would probably port her helm to avoid the Normandie, which was coming up on the Umbria's starboard quarter, and therefore ordered his engines full speed ahead to avoid the danger consequent upon such a movement on the part of the Iberia. This assumption was clearly an insufficient excuse for the order. It is difficult to locate the exact position of a vessel in a fog, and still more difficult to determine her course and distance; and while a whistle continues to be heard so nearly ahead, it is manifestly unsafe to assume that she is upon a course that will take her clear. The assumption might be justified if the signals were often repeated and kept constantly growing fainter or broader off the bow; but in this case the Umbria

heard but two, or possibly three, whistles from the Iberia, the last one of which must have seemed nearer than the first, since the steamers were rapidly approaching each other. The Iberia could not have appeared to be further to southward than when her first signal was blown, since she had then ported two points, and was really further to the northward. In resuming his speed under such circumstances, the master acts at his peril. As was said by Sir Robert Phillimore, in the case of *The Kirby Hall*, 8 P. D. 71: "We wish to state with as much emphasis as possible, that those in charge of a ship, in such a dense fog as was described in this case, should never conjecture anything when they hear a whistle in such close proximity, as was the case here, whether the sound appears to them to come from a vessel approaching them or not." Of course there is a point depending upon the number, distinctness and apparent position of the approaching signals, beyond which precautions are unnecessary and the master has the right to assume that he has shaken off the other vessel, but it is entirely clear that that point had not been reached in this case, and that the immediate cause of the collision was the order to go ahead at full speed before the course and position of the Iberia had been definitely ascertained. Indeed, so gross was the fault of the Umbria in this connection, that we should unhesitatingly apply the rule laid down in *The City of New York*, 147 U. S. 72, 85, and *The Ludvig Holberg*, 157 U. S. 60, 71, that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor. It was suggested upon the argument that it was customary for large passenger steamers carrying the mails to run at full speed in a fog, and that this was really the safer course for them, as the greater the speed the sooner they pass the foggy belt. However this may be, the custom is not one to which the courts can lend their sanction, as it implies a flagrant disregard of the safety of other vessels.

2. But notwithstanding the negligence of the Umbria, the Iberia was chargeable with the duty of taking proper precautions, and, in judging of the propriety of her manœuvres,

we are obliged to accept the testimony of her officers and crew as conclusive, since there is no other testimony to contradict it.

It appears that she was bound toward New York harbor upon a course crossing to the northward, but still not far from parallel to that of the Umbria, and was proceeding at a speed of from three and a half to four knots an hour.  Her officers say that they heard the Umbria's first whistle about two points on her port bow; that her helm was immediately ported and her head put two points more to starboard, bringing her upon a northwest course, which she held until she came in sight of the Umbria.  This brought her upon a course more than two points divergent from that of the Umbria. While proceeding under this course, several more whistles were heard from the Umbria, bearing in about the same direction (allowing two points for the porting), and rapidly increasing in volume.  There could be but one interpretation put upon these signals.  A steamer was drawing rapidly nearer upon a course crossing that of the Iberia.  That she was nearing her was evident from the increasing loudness of each succeeding whistle; that she was not upon a parallel course was evident from the fact that the Iberia was herself upon a course which, if continued, would have carried her ashore upon Rockaway Beach.  The probabilities all were that the other steamer was bound out from New York harbor.

Under such circumstances, and in view of the fact that the exact position and course of the Umbria could not be determined, we think it would have been more prudent on the part of the Iberia not to have changed her course until the position and course of the approaching steamer had been definitely ascertained, although we should be reluctant to hold that such change of course was a fault on her part, which should condemn her in a moiety of the damages.  There are undoubtedly authorities and some expressions of this court to the effect that a change of the helm, in ignorance of the exact position and course of an approaching vessel, is a fault, although we have never held that it would be a fault in every case presenting these conditions.  *The Sea Gull*, 23 Wall. 165, 175, 177; *The*

*City of New York*, 147 U. S. 72, 85; *The James Watt*, 2 W. Rob. 270; *The Alberta*, 23 Fed. Rep. 807, 811; *The Bougainville*, L. R. 5 P. C. 316; *The Franconia*, 4 Ben. 181, 185; *The Shakespeare*, 4 Ben. 128; *The Lorne*, Stu. Vice Adm. 177; *Western Metropolis*, 2 Ben. 399, 402; *The Hammonia*, 4 Ben. 515, 522; *The Northern Indiana*, 3 Blatch. 92, 110; *The North Star*, 43 Fed. Rep. 807; *S. C.* 22 U. S. App. 242, 252; *The Fountain City*, 22 U. S. App. 301; *The Arthur Orr*, 69 Fed. Rep. 350; *The Resolution*, 6 Asp. Mar. Cas. 363.

We think, however, that a more reasonable position in this connection was taken by the House of Lords in the case of *The Vindomora*, (1891) App. Cas. 1, in which it was held that there was no rigid rule that where two steamships were approaching each other in a fog so as to involve risk of collision, neither ship ought to alter her helm until the signals of the other gave clear indication of her direction; and that each case must depend upon its own circumstances, which might afford reasonable ground for believing what the direction must be. In that case it was argued that one of the steamers concerned must be held in fault for having starboarded before her officers knew the direction in which the approaching steamer was coming. In considering this, Lord Herschell remarked: " I do not think the cases which the learned counsel cited support the proposition that there is any such absolute hard and fast rule as that a vessel having only the indication of a single whistle from the other vessel is never justified in manœuvring, and must always be held to blame if she does manœuvre. I should be very sorry to say anything to indicate any dissent from the view that where two vessels are approaching one another in a fog, without any sufficient indication to justify action, neither vessel would be justified in altering her course. I think the proper steps to be taken in such a case would be for each vessel to keep the course on which she was proceeding. But although I entirely agree that that is a good general rule to lay down, yet that rule must be interpreted in each case according to the circumstances of that case. It is impossible to lay down an abstract rule of that description which shall be applicable to all cir-

cumstances, to all parts of the seas, and to all positions of vessels." In that case, as the whistle of the approaching steamer was heard broad off the starboard bow, it was held that the other vessel was not in fault for starboarding, and that such starboarding did not contribute to the collision. See, also, *The Frankland & Kestrel,* L. R. 4 P. C. 529, 533.

Upon these considerations, while we think it would have been more prudent in the Iberia not to have changed her course, yet in view of the fact that the whistle of the Umbria appeared to come from off her port bow, we should be unwilling to say that it was necessarily a fault on her part to port her helm two points, the effect of which would be to give the Umbria more room. It is possible that, under the peculiar circumstances, the Iberia had a right to assume that the Umbria was outward bound from New York, and pursuing a course substantially parallel to her own.

The question whether the Iberia performed her whole duty in continuing upon her course, even at a low rate of speed, instead of stopping when the whistles of the Umbria were repeated and apparently drawing nearer, remains to be considered. The only two articles of the Revised International Regulations of 1885 (23 Stat. 438) which have any pertinence to the case are the following :

"Art. 13. Every ship, whether a sailing ship or a steamship, shall in a fog, mist or falling snow go at a moderate speed."

"Art. 18. Every steamship, when approaching another ship so as to involve risk of collision shall slacken her speed, or stop and reverse, if necessary."

The former of these articles deals with the general speed of ships in a fog ; the latter, with the special precautions to be observed after the proximity of another vessel has been ascertained by her signals. As the general speed of the Iberia did not exceed four knots an hour — the lowest speed necessary to the maintenance of steerageway — it is clear that she was guilty of no violation of the thirteenth article.

Her conduct, after the whistles of the Umbria began to be heard by the Iberia's officers, is deserving of more serious

consideration. We certainly do not wish to be understood as holding that it is necessary for a steamer to stop the moment she hears a whistle ahead of her in a fog, though it be directly ahead. Under such circumstances she may proceed at a reduced rate of speed; but if the whistle be repeated two or three times, and appear to be drawing nearer, the authorities generally hold that, if the fog be dense, prudent navigation requires that she shall stop her engines and drift ahead, until the approaching steamer comes in sight, or her whistles indicate that the two vessels are well clear of each other.

A review of the leading cases upon the subject will exhibit the circumstances under which it has been held that steamships, navigating in a fog or other atmospheric obscuration, are bound to stop upon hearing signals from vessels, the exact position and course of which it is impossible to ascertain.

In the case of *The Hypodame*, 6 Wall. 216, the earliest case in this court, a steamer proceeding at the rate of six to eight miles heard a hail before it from a vessel exhibiting no light, and immediately slowed her engines, and then stopped. She was held to have been in fault for not *instantly* stopping and reversing her engines.

The next is that of *The Colorado*, 91 U. S. 692. In this case a propeller was proceeding in a dense fog at the rate of five or six miles an hour. Hearing the blast of a fog horn from a sailing vessel, which was crossing her course at the rate of four miles an hour, it was held that her speed was excessive, and that any speed was too great which did not enable the steamer to perform the duty imposed upon her by the act of Congress " to keep out of the way of the sailing vessel," if the latter has in all respects complied with the rules of navigation.

In *The City of New York*, 147 U. S. 72, it was held that a steamer proceeding at her usual speed, upon hearing the fog horn of a bark only one point on her starboard bow, should at once have checked her speed, and if the sound indicated that the approaching vessel was near, should have stopped or reversed until the sound was definitely located, or the vessels came in sight of each other.

And in *The Martello*, 153 U. S. 61, a steamer leaving the port of New York in a dense fog, at a speed of five to six miles an hour, heard a blast from a fog horn on her starboard bow, indicating that a vessel was approaching from a direction which might take her across the steamer's bow, and was held to have been in fault for not at once stopping, until, by repeated blasts of the horn, she could assure herself of the exact bearing, speed and course of the approaching vessel.

The English cases, upon the subject of speed, are much more numerous and explicit. In that of *The Frankland & Kestrel*, L. R. 4 P. C. 529, two steamships were approaching each other in a fog so dense that vessels could not be seen at a greater distance than 200 or 300 feet. The speed of each vessel was *not over two to two and a half knots* through the water. The finding of the admiralty court was that "both vessels were going, in truth, in the most absolute uncertainty as to the proceedings of the other"; and the opinion of that court, fortified by that of its nautical assessors, was "that upon hearing the whistles of each other so near and approaching each other, each vessel ought not only to have stopped, but to have reversed until its way was stopped, when it could have hailed and ascertained with certainty which way the head of the other vessel was, and which way she was proceeding; and by that means the collision would or might have been avoided." The Privy Council was of the opinion that both vessels were going at a moderate speed; but that the Frankland, the only vessel which appealed, having heard a whistle sounded many times, indicating that a steamer was approaching her and had come very near to her — so near indeed that if the vessels had then stopped they would have been within hailing distance — should not only have stopped the motion of her engines, but should have reversed them, and that she ought not to have waited until the vessels sighted each other, when such a manoeuvre would have been too late.

In *The Kirby Hall*, 8 P. D. 71, it was said to be the first duty of those who have charge of a steamship in motion during a dense fog, on first hearing the whistle of a steamship in such close proximity to them that a risk of collision is involved,

to bring their vessel immediately to a standstill, and not to execute any manœuvre with her helm until they have definitely ascertained the position and course of the other ship. In this case, although the Kirby Hall was going *dead slow*, it was held that she was to blame for not stopping when the whistle of the approaching steamer was heard the first time near at hand, instead of going ahead without knowing where the other vessel was or what she was doing. And said the court: "We wish to state with as much emphasis as possible, that those in charge of a ship in such a dense fog as was described in this case should never conjecture anything when they hear a whistle in such close proximity as was the case here, whether the sound appears to them to come from a vessel approaching them or not." The fog was "as dense a fog as one can well imagine."

In *The John McIntyre*, 9 P. D. 135, a steamer hearing a whistle on her port bow in a *dense* fog, "so thick that she can hardly see before her," slackened her speed. Later on the whistle was repeated two or three times, clearly nearing her and in her vicinity, but she did not then stop and reverse; and it was held that she was in fault. The approaching steamer, the Monica, though making only three knots an hour, was admitted to have been in fault.

In *The Dordogne*, 10 P. D. 6, the master of the Dordogne, while running in a dense fog, heard a whistle three points off her starboard bow. On hearing it, the engines were stopped. The whistle was again heard broader on the starboard bow, and was replied to and the engines again set ahead. The engines were again stopped and again moved ahead. It was held that, considering the way in which these vessels were approaching each other, the officer in charge ought to have brought the Dordogne to a standstill, and, when the other vessel was coming nearer to him, he should have stopped and reversed. The other vessel — the Edith — was admitted to be in fault, though proceeding "dead slow."

In the case of *The Ebor*, 11 P. D. 25, the rule was still more stringently enforced. In this case, the plaintiff's steamer heard a whistle almost directly ahead in a "thick" fog. She was

then going only about three knots an hour, and continued at this speed for about a minute, until a second whistle was heard, when the order was given to stop and reverse; but the defendants' steamer coming in sight, a collision occurred. The defendants admitted that they were to blame, though making only three knots an hour, but it was also held that the officer in charge of the plaintiff's steamer, on hearing the first whistle, should have reduced her speed to as slow a rate as possible, only keeping her under command, and was in fault for failing so to do.

In the case of *The Ceto*, 14 App. Cas. 670, it was held that where two steamships, invisible to each other by reason of a *dense* fog, find themselves gradually drawing nearer until they are within a few ship's lengths, each of them ought at once to stop and reverse; unless the fog signals of the other vessel have unequivocally indicated that she is steered so as to pass clear without involving risk of collision; or unless other circumstances exist which make it dangerous to stop and reverse. The exact speed of the two steamers was not given, although it is stated in one of the opinions that the Ceto was going "dead slow," while the Lebanon had reduced her speed to "easy." Both were held to blame. In the latest English case upon this point, *The Lancashire*, (1894) App. Cas. 1, two steamships were approaching one another on opposite courses in a fog. They came in sight of each other at a distance of 450 feet. The Ariel was conceded to be in fault. The Lancashire, although proceeding only at the rate of three and one half knots an hour, stopped her engines on hearing the repeated whistles of the Ariel a point and a half on her starboard bow, but was held in fault for not reversing.

It is apparent from an examination of these cases that they are distinguishable from the one under consideration in two important particulars, viz., that the fog was dense, and that the approaching vessel was herself running at a comparatively low rate of speed.

In every case the fog was described as "dense" — in *The Frankland & Kestrel*, "so dense that vessels could not be seen at a greater distance than two or three hundred feet" —

in the Kirby Hall, " as dense as one can well imagine," 6 Asp. Mar. Law Cas. 90, — in the John McIntyre, " so thick she can hardly see before her," 6 Asp. Mar. Law Cas. 278, and in the others simply as " dense," or " thick." Under such circumstances, it might well be held to be the duty of each steamer to stop and reverse her engines and feel her way, until the course of the other had been definitely ascertained. But in cases of this kind much depends upon the density of the fog, and something must be left to the judgment and discretion of the master. Precautions, which might be indispensable in a fog so thick that vessels are invisible at a distance of three hundred feet, might become unnecessary and even burdensome if they can be seen at a distance of a thousand feet. It was said in the early case of *The Batavier*, 9 Moore P. C. 286, that " at whatever rate she was going, if going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate." This language was quoted with approval in *The Colorado*, 91 U. S. 692, 703.

So, too, in the case of *The Great Eastern*, Browning & Lushington, 287, it was said that " their lordships are of opinion that it is the duty of the steamer to proceed only at such a rate of speed as will enable her, after discovering a vessel meeting her, to stop and reverse her engines in sufficient time to prevent any collision from taking place." Similar language was used by this court in the case of *The Nacoochee*, 137 U. S. 330, 339.

The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway.

The fog in this case was what is termed intermittent; sometimes dense; sometimes light; occasionally lifting so much as

to permit other vessels to be seen, and again shutting down so as to hide them completely. That, immediately prior to the collision, it was not a dense fog is shown by the admitted fact that the steamers became visible to each other at a distance of from nine hundred to a thousand feet. Under such circumstances, if the Umbria herself had been observing the rule with regard to moderate speed, we think it would have been possible for the two steamers, by prompt reversal of their engines, to have avoided each other — at any rate, the master of the Iberia might, in the exercise of. sound judgment, have concluded that it was safer for him to maintain a low rate of speed than to come to a standstill.

It should also be borne in mind that she had a right to assume that, even if the Umbria were not pursuing the moderate speed required by the statute, at least she was not guilty of maintaining the extraordinary and reckless speed of nineteen knots per hour. While the signals of the Umbria indicated that she was approaching her very fast, the bearing of these signals tended to show that she was broadening off from, rather than bearing in upon, her course, and that the Iberia would probably pass the point of intersection before the Umbria reached it. Indeed, if it be true, as sworn by her witnesses, that the Iberia was proceeding on a N.W. course after she had ported, and the Umbria was proceeding on a course E. by S. ¾ S., and the whistles were several times heard four points on the bow of the Iberia, there could not have been any collision, since the courses of the two vessels would have crossed each other far astern of the Iberia. It is probably also true that, considering the great speed of the Umbria, it were better that the Iberia should keep her steerageway rather than stop her engines and reverse, since she would respond to her wheel more readily, if her engines were kept in motion than if her headway were entirely stopped. The case presented is not one where, if both vessels had stopped and reversed, the collision might have been avoided; but whether, under the facts as they subsequently appeared to be, the Iberia could be deemed in fault for a manœuvre which would have tended to avoid the collision rather than bring

it about, by aiding her in keeping out of the way of the Umbria.

The English cases are also distinguishable in the fact that the approaching vessel was herself running at a low rate of speed — generally at " dead slow," or, as in one or two of the cases, at " easy speed." Indeed, it does not appear that either vessel was running at a speed to exceed three and one half or four knots an hour, which, however, was held to be too great to enable two vessels to avoid a collision after they came in sight of each other. Under such circumstances, these decisions can have but an imperfect application to a case where one of the steamers is proceeding at " dead slow," and the other at her full speed of sixteen to nineteen knots an hour. While we do not question the soundness of Lord Halsbury's observations in the case of *The Ceto*, that the solution of the question of speed must not depend upon the state of facts afterwards ascertained, unless there was enough to tell both parties at the time what the condition of fact was, still the whole theory of the cases which hold it to be the duty of a steamer, meeting another steamer in a fog, to stop or reverse, is based upon the hypothesis that a collision may thereby be avoided; and if the facts afterwards ascertained indicate that such manœuvre, under the circumstances of a particular case, could not have subserved any useful purpose, the steamer ought not to be held in fault for the non-observance of the rule. These rules are intended solely for the prevention of collisions, and if it be clearly apparent that the observance of a certain rule would not have prevented a collision in the particular case, the non-observance of such rule becomes immaterial. Thus, there are a number of cases holding that after two vessels have approached each other so near that a collision has become inevitable or imminent, the master of either may, in the exercise of a sound judgment, put his engines at full speed with a possibility thereby of escaping contact, or of easing the blow (as was actually done by the Iberia in this case); although if he had done it before the collision had become imminent, it would have been a gross fault. Indeed, Article 23 of the International Regulations makes special provision for exceptional

cases by declaring that "in obeying and construing these rules due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Upon this subject, it was said by this court in *The Cayuga*, 14 Wall. 270, 275 : "Persons engaged in navigating vessels upon the seas are bound to observe the nautical rules enacted by Congress, whenever they apply, and in other cases to be governed by the rules recognized and approved by the courts. Nautical rules, however, were framed and are administered to prevent such disasters and to afford security to life and property, but it is a mistake to suppose that either the act of Congress, or the decisions of the courts, require the observance of any given rule in a case where it clearly appears that the rule cannot be followed without defeating the end for which it was prescribed or without producing the mischief which it was intended to avert."

In the English cases above cited, both vessels were proceeding at a rate of speed no greater than that of the Iberia, and both were held in fault for not stopping and reversing, because, if that had been done promptly, no collision would have occurred; but, if it turn out that the approaching vessel was proceeding at such a rate of speed that a collision could not possibly have been avoided by the other stopping and reversing, it cannot be said to have been at fault with respect to such approaching vessel, that she still continued to keep her engines in motion. In this case it is manifest that no precautions on the part of the Iberia would have been of the slightest avail, in view of the extraordinary speed of the Umbria. It is true that if she had stopped promptly, she might not have reached the point where the courses of the two steamers intersected; but it is equally true that if she had been going at a much greater speed than she was, she would have passed the point of intersection before the Umbria reached it. Manifestly this is not the proper test. The propriety of certain manœuvres cannot be determined by the chance that the two vessels may, or may not, reach the point of intersection *at the same time*, but by the question whether their speed can be stopped

before their arrival àt the point where their courses intersect. If two steamers are approaching each other in a fog, manifestly their manœuvres must be determined, not by the chance of their meeting at a point where their courses intersect, but upon the theory that their courses shall not actually intersect — in other words, that both shall stop before the point of intersection is reached ; and if one of them is running at such a speed that no manœuvre on the part of the other can prevent that one from passing the point of intersection, the latter only is responsible.

The court is, therefore, unanimously of opinion that the damages should not have been divided. The majority think that the Iberia was not in fault, while other members of the court rest their conclusion upon the view that, even if she were in fault, such fault did not contribute to the collision.

3. Error is also alleged in the refusal of the Court of Appeals to allow as an item of damage the probable profits of a charter party made October 27, 1888, about a fortnight before the collision, under which the Iberia, described as then being on a voyage from Aden to New York, was to proceed to Cadiz in Spain with a cargo of tobacco. There was clearly no error in rejecting this item. There is nothing in the peculiar facts of the case to take it out of the general rule that in cases of total loss by collision damages are limited to the value of the vessel, with interest thereon, and the net freight pending at the time of the collision. The probable net profits of a charter may be considered in cases of delay, occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs. In such cases the net profits of a charter, which she would have performed except for the delay, may be treated as a basis for estimating the value of her use. *Williamson* v. *Barrett,* 13 How. 101, 110, 112 ; *The Potomac,* 105 U. S. 630 ; *The Mayflower,* Brown's Adm. 376 ; *The Belgenland,* 36 Fed. Rep. 504 ; *The Gorgas,* 10 Ben. 666 ; *The Argenturo,* 13 P. D. 191 ; *S. C.* 14 App. Cas. 519 ; *The Mary Steele,* 2 Lowell, 370.

But in cases of total loss the probable profits of a charter, not yet entered upon, are always rejected. In the case of *The*

*Amiable Nancy*, 3 Wheat. 546, which was one of an illegal seizure by privateers, a claim made for loss of supposed profits of the voyage on which the vessel was originally bound was held to have been properly rejected. Said Mr. Justice Story: " The probable or possible benefits of a voyage as yet *in fieri*, can never afford a safe rule by which to estimate damages in cases of a marine trespass. There is so much uncertainty in the rule itself, so many contingencies which may vary or extinguish its application, and so many difficulties in sustaining its legal correctness, that the court cannot believe it proper to entertain it. In several cases in this court, the claim for profits has been expressly overruled ; and in *Del Col* v. *Arnold*, 3 Dall. 333, and *The Anna Maria*, 2 Wheat. 327, it was, after strict consideration, held, that the prime cost, or value of the property lost, at the time of the loss, and in case of injury, the diminution in value, by reason of the injury, with interest upon such valuation, afforded the true measure for assessing damages."

So, in England, in the case of *The Columbus*, 3 W. Rob. 158, it was held that where the vessel was sunk in a collision and compensation awarded to the full value of the vessel, as for a total loss, the plaintiff would not be entitled to recover anything in the way of demurrage for the loss of the employment of his vessel, or his own earnings, in consequence of the collision. See, also, *The Clyde*, Swabey, 23 ; *The North Star*, 44 Fed. Rep. 492.

In cases of a partial loss there is no injustice in allowing the probable profits of a charter for the short time during which the vessel is laid up for repairs, but in cases of a total loss the recovery of such profits is limited to the voyage which the vessel is then performing, since, if the owner were entitled to recover the profits of a future voyage or charter, there would seem to be no limit to such right so far as respects the time of its continuance ; and if the vessel were under a charter which had months or years to run, the allowance of the probable profits of such charter might work a great practical injustice to the owner of the vessel causing the injury.

The cases relied upon by the libellant do not support his con-

tention. *The Canada*, Lushington, 586, was a case of total loss, in which the measure of the loss of freight was said to be the gross freight contracted for at the time of the accident, less the charges which would have been necessarily incurred in earning it. The case is somewhat imperfectly reported. The vessel was carrying a cargo from Cadiz to St. Johns, New Brunswick, and was lost before reaching that place. She was also under a charter to carry timber from Quebec to England, but it does not appear clearly from the report whether the freight upon this charter was allowed, or whether the freight spoken of in the report was not limited to the freight earned upon the voyage from Cadiz to St. Johns. *The Star of India*, 1 P. D. 466, was a case of partial loss, and, in addition to demurrage pending repairs, the vessel was allowed a compensation for the loss of a charter party which had been cancelled by reason of her being unable to take the cargo at the time agreed upon. This does not differ materially from the rule in this country. So, too, in the case of *The Consett*, 5 P. D. 229, the vessel was injured by collision, and compelled to put into port to repair. The repairs occupied so long a time that it was not possible for her to fulfil a charter into which she had entered, and so was allowed damages for its loss. In the case of *The Freddie L. Porter*, 8 Fed. Rep. 170, a vessel, totally lost by collision, was chartered for a fixed time, and was lost during the continuance of the charter, before it had expired. Her owner was allowed the profits of the whole charter. The decision was admitted to be an advance upon any which had been previously made, but it is no authority for the allowance of a charter, the performance of which had not been entered upon.

Upon the whole, we think the opinion of the Court of Appeals dividing the damages was erroneous, and that

*The decree of the District Court of January 13, 1890, with respect to the question of liability should have been affirmed, and the case is therefore remanded to that court with directions to enter a new decree in conformity with this opinion.*