THE COMMONWEALTH.

(District Court, S. D. New York. January 15, 1910.)

COLLISION (§ 39*)—CAUSE—EVIDENCE.

Collision at the eastern entrance to Long Island Sound between the steamer Volund proceeding eastward through the sound and the steamer Commonwealth proceeding toward New York. The Volund was going at a moderate rate of speed and while her navigation was in some respects

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

subject to criticism, *held* that the Commonwealth was solely in fault because of her excessive speed of about 18 knots.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 39.*]

(Syllabus by the Judge.)

Action by Ole Irgins and others against the steamer Commonwealth. Decree for libellants.

Wallace, Butler & Brown, for libellants.

Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge. This action was brought by Ole Irgens and Axel Irgens, owners of the steamer Volund, and several members of her crew, against the steamer Commonwealth to recover their losses for the value of the steamer, loss of personal effects, and personal injuries, said to aggregate $76,000, suffered by reason of a collision between the said steamer and the steamer Commonwealth in the Race, the easterly entrance to Long Island Sound, on the 26th of September, 1908. The Commonwealth was also damaged to the extent, it is said, of $40,000.

The libel alleges that the Volund was proceeding, about 1 a. m., with all her regulation lights set and brightly burning, on a course of E. ¼ S. by compass and had reached a point in the vicinity of and to the northward of Little Gull Island, when a thick fog shut in, whereupon her engines were slowed; that a few minutes after 1 o'clock, the engines were stopped for a minute or thereabouts to ascertain as accurately as possible, the bearing of the siren of Little Gull Island; that the steamer then proceeded at slow speed as before until she brought the siren to a safe bearing well abaft her starboard beam and the Race Rock trumpet to a bearing of about a point on her starboard bow; that her engines were again stopped for a minute to determine these bearings as accurately as possible; that again proceeding at slow speed her course was changed to south-east for a few minutes, then to south ½ east; that under a slow speed she proceeded on this course making only about 2½ miles an hour through the water, carefully sounding her regulation fog signals as required by the rules of navigation; that the master and chief officer were on the bridge, a competent lookout was stationed forward on the forecastle head and a competent man at the wheel and they and the rest of the crew were properly stationed and vigilantly attending to their respective duties; that while proceeding in this manner, and at about 1:38 a. m., the whistle of a steamer, which afterwards proved to be the Commonwealth, was heard by the officers of the Volund and reported by the lookout bearing nearly abeam on the port side and apparently a considerable distance away; that the engines of the Volund were at once stopped in order to locate the whistle; that a repetition of the whistle was heard bearing apparently right abeam, whereupon the Volund again started her engines under a slow speed order, sounding her fog signal at short intervals; that after 3 or 4 repetitions of single whistle fog signals from the other steamer, a double whistle signal was heard from her, which was afterwards repeated; that this signal consisted

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of two prolonged blasts resembling the signal prescribed by the International Rules for a vessel stopped and without way; that shortly afterwards the general lights and the green side light of the Commonwealth were seen, already at close quarters somewhat forward of the Volund's port beam and the Commonwealth loomed up out of the fog approaching at a high rate of speed, sounding at the same time a signal of 3 blasts; that as soon as the lights of the Commonwealth could be seen, the engines of the Volund were at once stopped and reversed full speed astern and every effort made to back clear; that nevertheless the Commonwealth kept on and struck the Volund a terrific blow on her port side about 30 feet from the stem, tearing a great hole in her side, puncturing the collision bulkhead and causing the Volund to fill and rapidly settle by the head, sinking a short time later with the property and personal effects of those on board, becoming a total loss; that the crew escaped with their lives, being picked up by the Commonwealth, although one of the libellants, who was acting as lookout, was thrown to the deck by the force of the collision and sustained severe personal injuries and another libellant, the helmsman, was struck by the wheel and severely injured. It is further alleged that the collision was not due to any fault or error on the part of those navigating the Volund, but was due solely to the negligence of those on the Commonwealth in that: (1) she was proceeding at an immoderate and excessive speed in a dense fog, (2) she did not maintain a vigilant or proper lookout, (3) she did not stop her engines upon first hearing the fog signal of the Volund, (4) she did not seasonably slow, stop and reverse, (5) she attempted to cross the bow of the Volund instead of going under her stern and (6) she did not give proper fog signals.

In her answer, after some admissions and denials, the Commonwealth alleged:

"Eighth: Further answering, this claimant alleges that it is a corporation of Connecticut, and is the owner of the steamer Commonwealth, which is a new sidewheel passenger boat, built by William Cramp & Sons Ship and Engine Building Company, and by the Quintard Iron Works Company. She measures 445 feet 2 inches in length, with a beam over guards of 94 feet 7 inches. She is designed for speed of 23 statute miles per hour, and since June 23d last has been in the service on the Fall River Line, between Fall River via Newport and New York.

Ninth: On the night of September 25th, the Commonwealth had left Newport bound for New York. Fog was encountered for more than two hours before the collision and the Commonwealth had sounded regular prolonged fog blasts at one minute intervals. Her whistle is clear and powerful. The fog was not of a uniform density being less at the height of the pilot-house than below, but the steamer's speed was reduced to from 13 to 14 miles an hour. Her bright electric regulation lights were set and brightly burning. Her master, pilot and quarter-master were in the pilot house, keeping careful watch, which was also maintained by her watchman forward. The wind was light, tide ebb, and the Commonwealth's course was about W. ¼ S. She had heard the fog signals of and met three Eastbound steamers which were passed in safety.

Tenth: When the Commonwealth had entered the narrow neck or passage known as the Race, and had made the fog whistles of Race Rock, and was upon the course aforesaid, her lookout and officers who had been attentively listening for signals, suddenly saw a white masthead light bearing between one and two points on the steamer's starboard bow. No colored lights were

then shown, and the vessel was not giving any sound signals. Those on the Commonwealth could not tell whether this was a meeting vessel, or if she was being overtaken, but they instantly rang for full speed astern and placed the helm hard a starboard, followed by two short blasts as required to indicate her starboard helm. Just after that one faint whistle from the other steamer, which the Commonwealth followed by sounding several alarm blasts. The other steamer approached athwart the Commonwealth's course showing a red light just before she was struck. The stem of the Commonwealth struck a square blow upon the port bow of the steamer (which proved to be the Volund), so that the Volund soon went down by the head. The Commonwealth lowered four of her boats, and rescued all the Volund's officers and crew, as the Commonwealth anchored until all had been picked up.

The collision was at 1:19 A. M. and occurred near the middle line of the Race Channel, with Race Rock fog signal sounding about abeam of the Commonwealth.

Eleventh: By said collision the Commonwealth had both hawse-pipes driven in and sustained other damages, the cost to repair which, with the delay incident thereto, amounts to about forty thousand dollars.

Twelfth: Said collision was not due to any neglect on the part of the Commonwealth, but was solely due to the faults of the libellant's steamer Volund, in not keeping a proper course, but in steaming athwart the passage of the Race, also that no proper or licensed officer was in charge; had no sufficient lookout; had no efficient whistle; failed to give proper whistle signals, and kept on after hearing repeated whistles of the Commonwealth, in not stopping as required by Article 16, and especially that when heading square across the passage of the Race and warned by repeated whistles that a steamer was coming through to the westward, the Volund nevertheless kept on a dangerous course tending to intercept and collide with such inbound steamer, which course was unchecked even after the two starboard helm signals of the Commonwealth had been sounded; and in other faults which will be shown upon the trial."

It appears that the Volund was a small Norwegian steamer, measuring 1087 tons gross, 670 tons net. Her length was about 230 feet and her ordinary full speed about 8 knots. She was drawing 11 feet aft, 5 feet 3 inches forward. She was on a voyage from Newburg, New York, to Windsor, Nova Scotia, in ballast and had left New York the afternoon of September 25th. She passed Hell Gate between 2 and 3 p. m. and Cornfield Lightship at 11.40 p. m.

The Commonwealth left Newport for New York as stated in her answer. It says that her speed was reduced to 13 or 14 miles an hour. It is denied, however, that she was actually making 16 statute miles an hour. It is claimed by the libellant that her speed was not less than 18 knots through the water. There was a tidal current from 1½ to 4 knots at various stages of her journey, running in an easterly or south-easterly direction. Eldridge's chart, admittedly correct, shows 4 knots at the place of collision. I think there can be little doubt that the Commonwealth's speed through the water was fully 18 knots, making a speed of 20.7 statute miles. She stopped and reversed just before the contact, obtaining a few revolutions of the engines astern but without materially affecting her speed. It appears that she, with other vessels of the line, habitually navigated in fogs at nearly or quite full speed in order to arrive at various points on schedule time but it is needless to say that this affords no justification for the excessive speed of this occasion. She must therefore be condemned for this fault and it is unnecessary to consider the minor ones claimed against her.

During the trial I expressed the opinion that the Commonwealth was in fault but reserved decision to ascertain whether or not the Volund was also in fault. At that time I had not read the depositions of the Volund's witnesses, taken before the trial, but have since done so.

The Commonwealth contends that the Volund was also going at an excessive rate of speed, that is, at her ordinary full speed of 8½ miles an hour.

All of the logs of the Volund were lost in the collision, therefore her side of the account is dependent upon oral statements of her crew. It is conceded that she was kept at full speed until she came to Little Gull. Up to that time, a part of the testimony shows that she had met with some fog but did not reduce her speed on account of it. The lookout said that at 12 o'clock it was foggy but no signals were given. At 1 o'clock, she stopped to listen for Little Gull, which was heard off her starboard bow and judged to be abeam at 1:05 and about 2 miles distant. The fog whistles were commenced about 10 minutes before 1 o'clock and they were sounded 6 or 7 times when Little Gull was heard. The master had thought of anchoring if he could not make the Race Rock signals but he did hear them and kept on. A couple of days after the collision the captain made a precise diagram on a Government chart, of the steamer's movements from off Little Gull to the point of collision. It shows the steamer about 2¾ nautical miles north of Little Gull at a point marked "A" at 1 o'clock, thence proceeding east ¼ south to a point marked "B," about 2 miles, reached at 1:25 o'clock, thence proceeding south-east to a point marked "C," less than ¼ of a mile, reached at 1:27 o'clock, thence proceeding south ¼ east to a point marked "D," where the captain heard the Commonwealth's whistle at 1:38 o'clock, and then to a point marked "E" where the collision happened at 1:39. The distance from "C" to "E" was about 1¼ miles. The whole distance from "A" to "E" was 3½ miles which the Volund made between 1 o'clock and 1:39 o'clock, at the rate of about a mile in 11 minutes, or about 5½ miles an hour over the ground.

All the testimony shows very careful navigation with respect to speed after entering upon a course to pass through this dangerous place and nothing appears against the Volund with respect thereto except what may be gathered from the chart alluded to here and even assuming its correctness, it does not seem that the Volund should be condemned for excessive speed.

It is also contended by the Commonwealth that the collision happened not at 1:42 o'clock, as claimed by the Volund, but 23 minutes earlier, that is, at 1:19 o'clock and that therefore the speed of the Volund was greater than she claimed. There was doubtless considerable variation between the times indicated by the clocks of the respective steamers but what this amounted to is in too much doubt to permit the difference to be of any value in reaching a determination in this connection, especially as the Volund's time pieces were all lost and little is known about them.

The next important question is whether the Volund was in fault for adopting the course of south ¼ east, which caused her to expose her broadside to any vessel intending to pass through the channel to the westward. The captain's theory was that a prudent course required him to locate his position by means of Race Rock before undertaking to continue on a course through the Race. This could not be done if she kept over to the southerly or starboard side of the passage between Little Gull and Race Rock. The danger was that if she pursued a course on the southerly side of the passage she would be apt to be put ashore by the tidal current on that side and if she passed Great Gull and Little Gull successfully, but without hearing Race Rock, her subsequent course, founded on no certain point of departure, would be dangerous. Doubtless a vessel making considerable speed as compared with the tidal velocity could pass through the Race on the southerly side by dead reckoning from her last point of departure, with some assistance from the fog signals on Little Gull. But for a vessel going 2½ or 3 miles an hour to attempt the same thing in a 4 knot current would require an accurate knowledge of the strength and direction of the current, which no one can be expected to have, or to assume any such risk. It was therefore prudent on the part of the master of the Volund to adopt a course that brought him within the sound of the signals even though it compelled the adoption of a crooked course. Although undoubtedly there was great danger in exposing the broadside of the Volund to any vessel navigating on the usual course through the Race, the master of the Volund was not bound to anticipate that any vessel which he would meet would be transgressing the law as to speed. I find nothing to indicate that if the Commonwealth had been proceeding at that moderate speed which the law demands, the course of the Volund would have interposed any obstacle to the Commonwealth's progress which would not or could not have been avoided by ordinary care and good seamanship. The Volund was endeavoring to reach the southerly side of the channel from the beginning of her change to the southward and when the Commonwealth came on the scene, the Volund was already somewhat to the south of the center line. The space that she was required to traverse across the channel after making Race Rock was not more than about 2 miles and the time required to cross it was inconsiderable. If the Volund had been somewhere else this collision would not have occurred but that she happened to be in the dangerous spot when the Commonwealth came along can scarcely I think be deemed negligent on her part.

In The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, a case of collision between that steamer and the Iberia in a dense fog off the coast of Long Island, the Iberia was undoubtedly an obstacle to the progress of the Umbria, yet she was not found in fault, the court holding that the Umbria was gravely in fault for excessive speed and solely liable. In The Kentucky (D. C.) 148 Fed. 500, a case in this court not appealed, the other vessel in the collision, the Exeter City, was at the time of collision lying at the mouth of Gedney Channel, across the track of incoming vessels and was collided with by

the Kentucky, which was about entering the channel. It was held that the Kentucky was solely in fault for excessive speed. I have not been referred to and am not aware of any authorities which hold a vessel in the Volund's position in fault for being in the Commonwealth's track.

· The Commonwealth contends that the Volund after hearing the former's whistle should have changed her heading so as to assume a position parallel with the former's course but it obviously would have been dangerous to make such an attempt and incur the risk of turning toward and confusing the other vessel.

The following part of Article 16 is relied upon by the Commonwealth:

"A steam-vessel hearing, apparently forward of her beam, the fog-signal of a vessel the position of which is not ascertained shall, so far as the circumstances of · the case admit, stop her engines, and then navigate with caution until danger of collision is over." Act Aug. 19, 1890, c. 802, 26 Stat. 326 (U. S. Comp. St. 1901, p. 2869).

In order to arrive at a conclusion with respect to this point, it is necessary to determine what were the whistles given by the Commonwealth and heard on the Volund. The former was blowing her regular fog signals at intervals of something less than a minute and blew a signal of two whistles when the vessels were near together to indicate a change of course to the left. The witnesses on the latter heard some of these signals but uniformly stated that they were about or nearly "abreast" of the Volund, except in the case of the wheelsman, who said he heard a whistle "on the port beam, a little forward of the beam." This man said he heard the whistle "several times." The lookout said he reported the whistle and the steamer stopped; that he heard 6 or 7 altogether to which he paid attention; that the first four whistles were "one at a time"; that they then came "two at a time" and after the two, another single whistle, which was the last he could remember; that the Commonwealth was in sight at the time of the last signal. The chief officer said he heard a whistle from the Commonwealth "about abreast," "right abreast  *  *  *  pretty far away" and they stopped the steamer. They then heard another on the same bearing and they started ahead again at slow speed; that he heard the signal "four times I guess; I didn't count them" and each time blew the Volund's whistle; that he next heard 2 blasts for a couple of times. "I could hear she was closer than when we heard her first whistle, but I couldn't see her.  *  *  *  Q. What did you think those signals of two blasts were? A. Well, I thought they were some kind of a tramp steamer, or something like that that was blowing 2 whistles for making no headway." Shortly after this the lights of the Commonwealth appeared, showing a "bunch of white lights.  *  *  * And about the same time we could see a green light. Q. What did you do then? A. We stopped and reversed full speed astern.  *  *  * Right away." He said that the lights were 4 or 5 points on the port bow and that she was "heading for right down on us nearly" and that the steamer was 500 or 600 feet away. Just before the ship struck, the Commonwealth blew a danger signal of 3 blasts. The captain also

heard the single blasts 4 or 5 times, bearing about the same. His statement more in detail was:

"Q. How many times did you hear these successive single blasts of this approaching vessel? A. About four or five times.

Q. About a minute apart? A. Not quite a minute.

Q. Pretty near a minute? A. Yes.

Q. They were all that you call fog whistles? A. Yes, sir.

Q. Long blasts? A. Yes.

Q. And they kept getting louder all the time? A. Yes.

Q. And they were bearing about the same? A. Yes sir, about the same as near as I can tell.

Q. A little forward of abeam? A. I don't think that they were any forward of abeam.

Q. Don't you as a navigator know that there was great danger when the bearing of an approaching vessel remains the same? A. Yes sir.

Q. And was there any change of the apparent bearing of these whistles? A. Well, I think it was coming more forward, yes.

Q. That is more forward on your port side? A. Yes, when I heard the two signal blasts—

Q. I have not got to that yet; but wasn't it true that the other whistles, the four or five single whistles were bearing more forward— A. No sir, more abaft.

Q. You mean to say any of those whistles were ever taken as bearing abaft your beam? A. Yes, I think so, more abaft the beam than forward.

Q. I am not asking with reference to the exact bearing, but was there any change; that is the first whistle you said was about abeam; were the second, third, fourth and fifth whistles about the same? A. Yes, I think they were about the same; I think it was getting a little more abaft.

Q. You think the whistles were sounding a little abaft the beam? A. Yes.

Q. How much? A. I said pretty near abeam; I don't know how much.

Q. Then as near as you are able to state they were nearly abeam? A. Yes.

Q. When you heard the signal of two blasts, that sounded very much forward of abeam? A. Yes.

Q. How many points? A. Four or five points, only she was pretty close then.

Q. When you say four or five points which way do you mean? A. From the stem.

Q. From your stem? A. Yes.

Q. Three or four points forward of the beam? A. Yes.

Q. Wasn't it true that the last whistle before the two blasts was one or two points forward of your beam? A. I couldn't say exactly; not as much as that; probably one point, half a point, something like that."

The foregoing statements with respect to "abreast" are rather suspiciously alike and I think affect somewhat the credit to be given to the witnesses. Nevertheless, even if the Volund was not following strictly the provisions of Article 16, I do not think that her remissness was such as to condemn her under the circumstances. It might reasonably have been concluded, up to the hearing of the signal of 2 blasts, that the vessel if navigating westward would go astern of the Volund and on that theory, her proceeding to the southward was in aid of such navigation. Even, however, if her navigation was faulty, she should be exonerated under the authority of the Umbria, supra, in view of the grave fault of the Commonwealth.

It is also urged by the Commonwealth that the Volund was not justified in keeping on after hearing the 2 blast starboard helm signal of the Commonwealth.

There is no doubt that these signals could not properly be regarded

as fog signals because this accident happened in inland waters, nor should they have been considered as deep sea signals under the International Rules. But I cannot hold the officers of the Volund obligated to treat them as passing or helm whistles because they were of too long duration and especially because passing whistles are prohibited by the Rules except as between vessels that are able to see each other. Even did the Commonwealth sight the Volund's masthead light when she gave the double blast signal, this did not justify her in giving such signal and in navigating accordingly. The Rules prohibit passing signals under these circumstances until the signal lights of the other vessel, from which the direction of her course can be inferred, come into view.

But even if the Commonwealth's criticism in this respect was well founded, it would not alter the result because any error on the part of the Volund at this time was in extremis, and in any event would have in all probability made no difference.

There is considerable legitimate criticism of the Volund's navigation but in view of the gross fault of the Commonwealth in proceeding at such a rate of speed, I do not think, under the authorities, that the Volund's minor faults are clearly enough established to entitle the Commonwealth to an apportionment of the damages. The Victory, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519, The Transfer No. 14, 127 Fed. 305, 306, 62 C. C. A. 223.

There will be a decree for the libellants, with an order of reference.