SEABOARD TUG & BARGE, Inc.

v.

REDERI AB/DISA.

No. 4805.

United States Court of Appeals, First Circuit.

June 25, 1954.

Arthur J. Santry, Boston, Mass. (Arthur J. Santry, Jr., Boston, Mass., on the brief), for appellant.

Leo F. Glynn, Boston, Mass. (Thomas H. Walsh, Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

We are concerned on this appeal with a collision between an ocean going motor vessel and a steel tank barge which occurred in the main ship channel of Boston Harbor after sunset but before dark on a clear evening in August. The channel at the *locus in quo* is straight and runs approximately southeast and northwest. For convenience we shall refer to it hereafter as though it ran east and west. The following facts are not in dispute.

The tug Seaboard, a craft about 60 feet long of 41 gross tons, pushing ahead of it the square ended barge Arco No. 5, a craft about 130 feet long with a freeboard, loaded as she was at the time, of about 3½ feet, entered the main ship channel from the south from the Western Way and turned west up the side of the channel which lay on her port, that is to say, up the southerly side of the channel. Soon thereafter the barge was in collision with the Swedish motor vessel Lia outward bound down the same side of the channel, that being the side which lay on her starboard. The bow of the Lia struck the starboard side of the barge a few feet back of the forward corner at an angle somewhere in the neighborhood of 45°. There can be no doubt, indeed the Seaboard admits, that the collision occurred on its port side of the channel and very near the channel's southerly edge. So much is clear, but there is the usual sharp disagreement as to the navigation of the vessels preceding the collision.

The Seaboard contends that as she entered the channel from the Western Way there was an inbound lumber steamer on her starboard bow coming up the northerly side of the channel which was so near that it was not safe and practicable for her to cross the channel [1] immediately, and that after that steamer passed she did not have time to cross ahead of the Lia because that vessel was then bearing down near the center line of the channel. Wherefore the Seaboard contends that she did the only safe and practicable thing which was to sound the two blast signal required for the unconventional starboard to starboard passing, and attempt to execute that maneuver, but that the maneuver failed because the Lia neither acknowledged nor obeyed the Seaboard's signal but continued on her way down channel to the point of collision.

The District Court, however, rejected the Seaboard's contention. It found that between the passage of the lumber steamer and the arrival of the Lia "there was ample time for even the slow moving hard-to-maneuver tug-barge unit to cross to the proper side of the channel. It had in fact time to move about 200 yards up channel before it sighted the Lia, and about 600 yards before reaching the spot of the collision. Moreover, while still in the left half of the channel, it had moved over far enough so that it was closer to the center line of the channel than was the Lia. This is indicated by the fact that when first seen from the Lia it was

1. Art. 25, Navigation Rules for Harbors, Rivers and Inland Waters Generally, 33 U.S.C.A. § 210:

"Steam vessel in narrow channel. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

showing its red light, and by the fact that, when it changed its course to its left as the ships approached, this brought it into such a position that at the moment of the collision it was moving across the bow of the Lia from the Lia's port to its starboard side, with the tug and the greater part of the barge still to the Lia's port side." Furthermore the District Court found that the lumber steamer passed the tug-barge unit just as the latter entered the channel, which at that point is 400 yards wide, and that the lumber steamer passed the Lia while it was still maneuvering out of its dock a mile up channel from the Western Way and over half a mile up channel from the scene of collision. Wherefore the court below concluded that the tug Seaboard was "at fault in proceeding up the channel on the wrong side without justification, and in directing its course directly across the course of the oncoming Lia in an attempt to pass on the starboard side of the Lia, and that these faults were the direct and proximate cause of the collision."

■ The proctors of the Seaboard contend that these findings are clearly wrong, and to demonstrate their contention they have submitted calculations to show that the lumber steamer could not have been where the District Court found that it was at the critical time. The calculations themselves may be accurate enough, but they are no better than the basic data upon which they rest, and that data consists of estimates of time, speed, distance and the positions of the vessels at different times, as given by various witnesses, principally the captain of the Seaboard, and such estimates, by lay witnesses at least, we have had occasion to say before are notoriously unreliable. The Gertrude Parker, Inc. v. Abrams, 1 Cir., 1949, 178 F.2d 259, 265; see also Griffin on Collision §

275. On the other hand, the finding that the lumber steamer passed up the channel well ahead of the Seaboard rests upon the testimony of eye witnesses who appeared at the trial, in part to be sure on the testimony of the pilots of the Lia who might be regarded as interested, but also on the testimony of the pilot of the lumber steamer itself who had no interest whatever in the case and who said that he did not see the tug-barge unit at all as he passed the Western Way, and that he passed the Lia as she was maneuvering out of her dock and before she had even entered the channel. Under these circumstances it goes wihout saying that we accept the District Court's findings of the Seaboard's causal fault for not crossing to the side of the channel which lay on her starboard side.

Proctors for the Seaboard, in addition to asserting that vessel's blamelessness, also attack the District Court's ultimate conclusion of fact and law that the Seaboard's fault was the sole cause of the collision. They say that the court below having found, as it did, that the Lia was guilty of a statutory fault for not blowing a timely danger signal, committed clear error in not finding and ruling that it had not been shown that this fault not only did not, but could not, have contributed to the collision, thereby failing to follow the rule laid down in The Pennsylvania, 1873, 19 Wall. 125, 136, 22 L. Ed. 148 wherein it was said that the burden rests upon the ship guilty of an actual violation of a statutory rule of showing "not merely that her fault might not have been one of the causes [of the collision] or that it probably was not, but that it could not have been."

■ It is true that the District Court found the Lia at fault for not sounding the danger signal required by Rule III of Art. 18 of the Inland Rules [2] immediately upon the failure of her pilot to un-

2. Art. 18, Navigation Rules for Harbors, Rivers and Inland Waters Generally, 33 U.S.C.A. § 203:
   "Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

derstand the course or intention of the Seaboard, and that he failed to understand her course or intention when the Seaboard sounded her two blast signal for a starboard to starboard passing, because up to that time, seeing the Seaboard's red port light, the Lia's pilot had good reason to believe that the vessels were in proper position for the conventional port to port passing and had every reason to believe that a starboard to starboard passing would be clearly dangerous and would not be attempted. But the court said that it was "difficult to see how this fault on the part of the Lia contributed in any substantial way to the causing of the collision." It pointed out that less than two minutes elapsed between the time of the Seaboard's first two blast signal and the collision, and that there was at the most only about one minute's delay by the Lia in sounding the statutory danger signal, and then it said that it did not seem likely that if, in compliance with the rule, the Lia had given its four blast signal a minute earlier, the slow-moving cumbersome tug-barge combination, which had already started to swing to port, could have been so maneuvered in that additional minute as to avert the crash. We agree.

We cannot believe that the Supreme Court in The Pennsylvania intended to establish as a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable or remote. Indeed, our interpretation seems to be supported by the decision in The Umbria, 1897, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053, and we do not see anything in Lie v. San Francisco & Portland S. S. Co., 1917, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726 that militates against it. Notwithstanding the dictum in The Martello, 1894, 153 U.S. 64, 75, 14 S.Ct. 723, 727, 38 L.Ed.

637, that the offending ship has the burden of showing that its statutory fault "could not by any possibility have contributed" to the collision, we nevertheless feel that in applying the rule of The Pennsylvania "we are limited to the reasonable probabilities."[3] The Mabel, 2 Cir., 1929, 35 F.2d 731, 732. And even assuming that a danger signal by the Lia a minute earlier than the one she gave could have told the master of the Seaboard anything with respect to the danger he was in from the vessel he clearly saw approaching and had signaled to, still it must be evident from the proximity of the vessels and the slow speed and lack of maneuverability of the tug-barge unit that the extra minute in all reasonable probability could not, as the District Court found, have given time for the latter to escape from the dangerous position in which it had placed itself.

The case of General Seafoods Corp. v. J. S. Packard Dredging Corp., 1 Cir., 1941, 120 F.2d 117, upon which the appellant relies is not in conflict with our holding here for in that case the master of the tug-barge unit saw the trawler Exeter for a considerable distance approaching on an erratic course on its wrong side of the channel, which should have apprised him of the fact that those in charge of the Exeter were inattentive and unaware of their danger and caused him to realize that a timely danger signal would alert them, yet he failed to sound his danger signal until too late to permit the Exeter to take action to avert the collision.

The appellant's contention that the speed of the Lia was excessive rests upon calculations which in turn rest upon testimony of time and distance by various witnesses. We reject it because of direct testimony of moderate speed given by the officers and pilots of the Lia, who may have been interested witnesses, but whose interest, if any, was for the judge who saw and heard them to evaluate.

---

3. In accord see The Aakre, 2 Cir., 1941, 122 F.2d 469, certiorari denied Waterman v. The Aakre, 314 U.S. 690, 62 S. Ct. 360, 86 L.Ed. 552; Griffin on Collision §§ 200, 201.

■ The further contention that the Lia had no proper lookout has been considered but found too insubstantial to warrant discussion.

■ The appellant's further contention that the court below erred in admitting in evidence a report of a Coast Guard Examiner showing that the master of the Seaboard had no license has also been considered only to be rejected. It was conceded at the trial, and it has been conceded here, that licensed personnel was not required by law on vessels of the Seaboard's type. The examiner's report was admitted only for the purpose of contradicting the testimony of the Seaboard's master that he had a license but had lost it, and thus to impeach his credibility. It is clear that the court admitted the report only for that purpose but it does not appear that the court made use of it. The matter is of little moment and in view of the trial court's wide discretionary powers in the premises we see no reversible error in the ruling.

The decree of the District Court is affirmed.