## THE KENNEBEC.

(District Court, S. D. New York. October 23, 1908.)

COLLISION (§ 85*)—EVIDENCE—FOG.

Collision in a fog in Boston Harbor between the Steamship Kennebec, inward bound, and a scow lying alongside of a dredge, engaged in improving the North Channel. The steamship *held* in fault for excessive speed and the dredge and scow for failing to sound fog signals and to hear the approach of the steamship.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 85.*

Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

(Syllabus by the Judge.)

Wing, Putnam & Burlingham and Edward S. Dodge, for libellant.
Carver & Blodgett, for claimant.

ADAMS, District Judge. This action was brought by the Daly & Hannan Dredging Company, owner of Dredge No. 6 and Scow No. 2, against the Steamship Kennebec, to recover the damages, said to be $9,000, sustained through a collision between her and the Scow No. 2, lying alongside of Dredge No. 6, in Boston Harbor on the 29th day of July, 1905.

The allegations of the libel are that the No. 6 was properly and lawfully stationed at a point about one mile distant E. by N. ¼ N. from Deer Island Light and about ⅜ of a mile S. W. ¾ W. from Great Faun Bell Buoy, engaged in the construction and improvement of what is called the North Channel, leading from President Roads eastward to Broad Sound, Boston Harbor, (an approach not then opened to navigation of large vessels) where the libellant was lawfully engaged in dredging under contract with the United States; that No. 6 was held in position by spuds at each corner and was heading about N. E.; that Scow No. 2 was made fast on the starboard side of No. 6, and other dredges and vessels were also engaged in the same work; that the wind was light and the tide not quite half flood; that the weather was foggy but objects could be seen quite plainly at a distance of from 400 to 500 feet. It is further alleged that about 5 A. M. of said day the Kennebec came up the channel, inward bound for Boston, and struck the No. 2 on the starboard side near the bow at about right angles, breaking her planks etc., and cutting into her deck about 3 feet; that the forward port spud of No. 6 was broken; that the steamer swung around along the starboard side of No. 2 and took off one

strake of about 75 feet and then proceeded on her way. It is further alleged that since July 25, 1905, the No. 6 has been at work in substantially the same place in which she was at the time of the collision; that the steamer has been employed in making daily trips to and from the coast of Maine; that owing to the fact that the dredging operations in the North Channel were unfinished, other vessels of the size and class of the Kennebec bound from President Roads to Broad Sound and vice versa, were using the South Channel; that the Kennebec, however, had occasionally previous to the collision been seen passing the dredges in the North Channel. It is further alleged that the collision was not caused or contributed to by those in charge of No. 6 or No. 2, which performed all the duties incumbent upon them, but was wholly due to the negligence of those in charge of the Kennebec in that she was proceeding at an improper rate of speed in a fog, had no proper lookout, was not in charge of a competent officer, did not give any sufficient sound signals, did not avoid the No. 6 and No. 2, which were stationary and fast to the ground, was not in the proper channel, did not seasonably slow, stop and reverse before the collision and did nothing to avoid the collision.

The allegations of the answer deny that the so-called North Channel was not open to navigation of large vessels; admit that the wind was light, the tide flood and the weather foggy but deny that objects could be seen quite plainly at a distance of 400 or 500 feet; admit that on the morning of July 29, 1905, the Kennebec when coming up the channel, inward bound from Boston, struck a scow near the end; admit that the steamer had been employed in making daily trips to and from the coast of Maine and used the so-called North Channel; deny that the collision was not caused or contributed to by those in charge of No. 6 or No. 2, and in general the allegations of fault charged against the Kennebec, and requiring proof of some other matters alleged in the libel. Further answering it is alleged that the Kennebec was approaching Boston on her regular trip from Bath, Maine; that when in the vicinity of Baker's Island, she entered a thick fog, which continued from that time until after the collision; that immediately upon approaching the fog the engines of the steamer were slowed down and from that time until the collision she proceeded at a reasonable rate of speed in a fog; that upon entering the fog and thereafter, she sounded fog signals regularly at intervals of at least every minute until after the collision; that the master, two pilots and the quartermaster were in the pilot-house and a lookout was properly stationed forward and so continued up to the time of the collision; that the steamer proceeded slowly and cautiously on her regular course, keeping a close lookout for sounds and vessels; that while so proceeding and when in the vicinity of Faun Bar, a dredge and scow were seen and reported by the lookout close aboard and nearly ahead; that no bell, whistle or other signal was being given upon the scow or dredge; that the engines of the steamer were immediately put full speed astern and her helm aport to try and clear the scow; that by these manœuvres the head of the steamer was thrown to starboard but she did not have time to clear and hit the scow about 4 or 5 feet from the end. It is

further alleged that if any notice by bell or otherwise had been given by those on the dredge or scow, the steamer would have had no difficulty in locating and avoiding them; that the steamer and those in charge of her were wholly without fault and did everything that could have been done to avoid a collision; that those on the dredge and scow were solely at fault for the collision in that they did not give any sound or signal or bell as required by vessels at anchor in a fog, especially in a channel, and when the steamer's whistle could or should have been heard approaching; in that they were improperly anchored or moored in an improper place.

Many witnesses were examined and a great volume of testimony taken. A great deal of this testimony related to matter not now in dispute.

The place of collision was fixed by United States engineers as being on the Eastern part of Little Faun Shoal, where there was a depth at mean low tide of about 12 feet. A few hundred feet to the southward and westward of No. 6 and No. 2 another dredge was anchored in about 15 feet of water. To the northeastward about a mile, two other dredges, known as Breyman Dredges, were anchored.

Dredge No. 6 was about 122 feet long and 40 feet wide. She had a square bow and a rounding stern. On her deck was a house of 2 stories containing the machinery and sleeping quarters of the crew. The dredging bucket, or dipper, and the long crane, or arm, by which it was held and operated, were at the bow of the dredge. She was held in position while working by 4 vertical timbers, called spuds or anchors, each 85 feet long and 3 feet square.

No. 6 had a bell on top of the lower house held by an iron frame. The bell was 8 or 10 inches in diameter at the mouth and about 12 inches high. It was rung by a cord leading down to the lower deck. She also had a steam whistle the sound of which could be heard for a half of a mile to a mile. Her machinery when working made considerable noise and the exhaust of her steam could be heard about the same distance.

The scow was 185 feet long and 40 feet wide. It was divided into 6 double pockets for holding dredged material. Each pocket was divided by a partition running athwartship, thus making 12 single pockets. At the bottom of each pocket was a gate fitted with chains and operated from the deck of the scow so that each pocket could be dumped as required.

Neither No. 6 nor No. 2 had any motive power of its own and was entirely dependent on tugs for navigation from place to place. By means of the dipper, or bucket, and of the chains operating it, however, No. 6 could, when occasion required, move forward about 10 or 12 feet.

The crew of the dredge, at the time of the collision, consisted of 2 engineers, 2 cranesmen, 2 cooks, 2 firemen, 5 deck hands and a watchman. One of the engineers was absent on the day of the collision. No. 2 had no crew, the necessary work upon her, operating the pockets and placing her, being done by the deck hands from the dredge.

The Government had been engaged for several years in straighten-

ing, widening and deepening the two channels, the North and the South, from President Roads to Broad Sound. At the time of the collision, the improvement of South Channel had been. completed, and that channel was abundantly provided with buoys and elaborate range lights and was in constant use by vessels, even of the greatest draft. The improvement of the North Channel was incomplete, the natural channel being deemed difficult and dangerous for all vessels except those of light draft.

On the morning of July 29th, 1905, No. 6 and No. 2 were engaged upon improvements then being made by the Government and about 5 o'clock this collision occurred. Dredges worked in North Channel whenever it was calm and there was no motion or sea. No. 6 had been working continuously, and in substantially the same position as that in which she was placed at the time of the collision since July 25, 1905.

On the day of the collision No. 6 began work at 4 A. M. in charge of her master. There was little or no wind, and except for the noise made by the dredge the morning was quiet. About 10 minutes before the collision, she was moved forward a few feet and a signal of two blasts blown upon her whistle. About 5 minutes later No. 2 was also moved and a signal of one blast was then blown upon the whistle of No. 6.

At the time of the collision No. 6 was made fast to the bottom by her spuds. No. 2 was alongside on the dredge's starboard side and extending forward of the bow of the dredge by about ½ the length of the scow. The tug Charles F. Dunbar was made fast to the port quarter of the dredge. They were all heading N. E. working upon a cut running N. E. and S. W.

A few minutes before the collision, it was found that the latch which should hold closed the bottom of the bucket of No. 6 did not work properly and after the bucket had been lowered to the bottom several times and had failed to bring up a load, the bucket was swung over No. 2 and the cranesman of the dredge stepped onto the scow to make the necessary repairs to the latch. Until the bucket was thus swung over, the engines of No. 6 had been making their usual noise, audible for some distance away, probably ½ of a mile to a mile. This noise continued up to shortly before the collision. The watchman of No. 6 had been ringing the bell of the dredge until about 5 minutes before the collision when he left it to go into the hold to oil the machinery.

The steamer struck the scow on the starboard side, 7 to 10 feet from the bow and about at a right angle. The scow was of heavy construction but the force of the blow broke several planks on the side, 2 stringers on the inside and 4 beams, started the decking all over the forward end of the scow and the plank shear; and generally strained and started the scow all over, making a cut in her side about 3 feet deep on the deck, extending, but not of that depth, below the water line. The force of the blow also cracked the forward port spud of the dredge, which was 3x3 feet in thickness, about ⅔ across.

The steamer after striking then swung around, bringing her port side to the starboard side of the scow and as she went ahead took off the mentioned length of strake of the starboard plank shear of the

scow. The steamer then passed out of sight in the fog. She did not stay by the No. 2, nor did she, in any respect, conform, or attempt to conform, to the requirements of Act September 1, 1890, c. 875, § 1, 26 Stat. 425 (U. S. Comp. St. 1901, p. 2902), but her failure merely placed upon her the burden of showing that she was not responsible for the collision. The Luzerne (D. C.) 118 Fed. 133, affirmed 157 Fed. 391, 85 C. C. A. 328.

The scow began to fill with water immediately after, and in consequence of the collision and the contents of three of her pockets, which had already been filled, had to be dumped in order to save her from sinking.

The Kennebec was a side wheel steamer 256 feet long and 45 feet beam. On the morning of the collision she was drawing 7 feet 6 inches forward and 8 feet 6 inches aft. She had the ordinary type of beam engine and was able to run at full speed from 10½ to 12 knots, making from 15 to 18 revolutions of her wheels. Her pilot house was on the upper deck 35 to 40 feet from her stem. At the time of the collision the windows were properly open. She was then running on a regular route between Boston and Gardiner, Maine, leaving each port upon alternate days, so that either going to or coming from Boston, she was constantly passing through Broad Sound. Her days for leaving Boston were Tuesday, Thursday and Saturday and for leaving Gardiner, Monday, Wednesday and Friday. On Friday, July 28th, she left Gardiner at 3:37 P. M.; and Bath at 6:44 P. M. and passed out of the Kennebec River by Sequin Light at a little after 8 P. M. Fog was first encountered when she was off Baker's Island Light but it was not of great importance until she reached the North East Graves Whistling Buoy at the entrance of Broad Sound, when it became thick and remained so until after the collision. At the time when she had the buoy abeam she had her lookout stationed on the forward deck, her quartermaster was at the wheel and her first pilot was in the wheel house in charge of her navigation. Subsequently the other officers, as claimed in the answer, came into the wheel house. At the buoy her course was changed to W. by S. ½ S. and thereafter until in the immediate vicinity of the dredge and scow, this course was maintained, except for a slight deviation shortly before the collision to avoid an anchored scow, from which there was an immediate return to said course. This course was not one laid down on any chart and involved a crossing of both the North Channel and the South Channel without the use of either of them in the manner indicated and intended by the Government publications with respect to navigation. With a small clearance, sufficient for safe navigation, of the whistling buoy to the northward and of the Deer Island Light to the southward, a course of W. by S. ½ S. would bring a vessel bound inward to the immediate vicinity of, if not directly to, the place where the scow was lying.

Until the arrival of the Kennebec at the Whistling Buoy, she had been running at her full speed of 10½ to 12 knots. At that place, or soon after passing it, the speed was reduced to about 7 knots an hour. For a little time she ran at this speed and then, it is claimed, her speed

was further reduced, while still going under one bell, by orders given from the pilot house to the engineer through the speaking tube, to turn the wheels as slowly as possible, which were observed and effected, it is claimed, a reduction to 2½ to 3 knots, the slowest speed she could run and preserve steerage way. It appears however, from the testimony of the first pilot, who was in charge of her navigation and from the log book kept by him, that she passed the Graves Buoy at 4:30 A. M. and that the collision occurred 25 minutes later or at 4:55 A. M. It is claimed that she made several stops during this time but it does not clearly appear that her engines were stopped more than once, and the stoppage was so short that headway was not lost to any appreciable extent. The distance from the Whistling Buoy to the place of collision was something over 3 knots, so that the average speed during this time was fully 8 knots per hour, some part of which, about a knot, was due to the flood current. When the steamer struck she was at right angles to the scow, lying N. E., and must have been heading about N. W. Her previous course had been W. by S. ½ S. and she swung therefore 5½ points, which indicates considerable headway, notwithstanding it was stated that she did not have headway enough to swing to any material extent. What the speed was immediately prior to the collision does not appear. The engines were reversed at full speed and made one or two turns back before the blow, but the steamer's headway was not materially arrested. From the foregoing and the damage done to the scow by the blow, the fact that one of the spuds of the dredge was broken, there can be little doubt that the speed was excessive, especially if the rule established in The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 615, 41 L. Ed. 1053, is to be followed. It was decided April 5, 1897. It was said:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law. In a dense fog this might require both vessels to come to a standstill, until the course of each was definitely ascertained. In a lighter fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway."

The Kennebec urges that the Umbria rule is unreasonable and should not be applied, as it has not been followed in all cases, citing particularly La Bourgogne, 86 Fed. 475, 30 C. C. A. 203, decided April 7, 1898, and The Benjamin A. Van Brunt, 98 Fed. 131, 38 C. C. A. 668, decided November 8, 1899. In the former the speed of La Bourgogne was not particularly in question and the Ailsa was held wholly in fault because she anchored outside of the anchorage limits. In The Van Brunt, the Pilgrim which collided with her was excused because it was held that she was exercising proper precautions though she was still under way and the Van Brunt solely in fault for anchoring in an improper place. The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123, however, was referred to with approval. It was there held that a steamer navigating in a dense fog must slow down to such speed as is consistent with the safety of other vessels using the channel, and if such speed does not afford sufficient steerage way, she should come

to anchor. That is practically the same as the requirement of the Umbria, and if applied to this case, it shows that the Kennebec was proceeding at too great a rate of speed. It is not contended by her that she was able to bring herself to a standstill before the collision. On the contrary, it is urged that although she was proceeding at a very slow rate, nevertheless the collision occurred, unavoidably as far as she was concerned, because she could not see the scow in time to stop her headway. There was a current of about seven-tenths of a knot an hour running somewhat across the channel but generally toward Boston, which accelerated the steamer's progress beyond the speed given by her engine. It is not necessary to determine the rate of speed the steamer was making. It is sufficient for the purpose of establishing her fault to find that she was running at too high a rate of speed for safety under the circumstances. The fog was not so dense but that the dredge lying to the S. W. about 400 feet could be seen and the Scow No. 2 could have been and doubtless was seen that distance.

It is also urged against the Kennebec that she had no competent nor proper lookout. It is true that the lookout had been continuously on duty from about 8 o'clock the previous evening, excepting when opposite Boon Island, he went below for 7 or 8 minutes to get some coffee. He then returned to lookout duty and remained there until about 4 o'clock in the morning, when he was relieved for a few minutes by the 1st and 2nd mates who took positions 12 or 15 feet from the stem and remained there. The lookout returned shortly and took a position from 4 to 8 feet behind these men but his faculty for observation was not diminished, and, although he must have been weary from his long vigil, he was the first to see the scow. When aided by the officers he was fully competent to perform his duties.

It is urged that the noise of a dredge working, which was heard on the steamer, was the No. 6, but the testimony of the steamer shows that the dredge noise they heard was from the Breyman dredges mentioned above, which the steamer passed on her starboard. Upon the whole, I think there was no proper criticism to be made upon the steamer with respect to lookout.

It is also urged against the Kennebec that she had no competent officer on deck. It is said of the master that his incompetency appears:

(a) In permitting the faulty stationing and disposition of the lookout and allowing the lookout mentioned above, called "bow watchman" to remain on duty for more than 8 continuous hours—4 times the usual length of a lookout's watch—until he became unfit for the performance of his duties.

It seems to be true that the lookout was on duty too long but he seemed able to withstand the strain and perform his duty.

(b) In permitting the excessive speed of the steamer. This is a just criticism.

(c) In taking a course from Graves Whistling Buoy which did not follow any of the usual or established channels.

The steamer was not bound to follow either of the channels if she could find enough navigable water elsewhere.

(d) In that personally he was an unfit person for command. "He testified before the court; and his inaccuracy, incoherency, and wild and random methods of answering questions, and pretending to point out locations on the chart, is spread upon the record, and can not fail to have impressed the court."

Capt. Colby impressed me on the trial as being an honest witness and a capable navigator, though not one using scientific methods. I do not consider that his estimates of the speed of his vessel were reliable; but apart from his statements in that particular, I believe that he told the truth substantially and intelligently, considering the stress he was under from a minute and able cross examination.

Fault on the part of the steamer being established it remains to be determined whether the scow was also in fault.

The principal allegation against her is the fact that neither she nor the dredge sounded any bell or made any other noise to warn the steamer of her presence. It is conceded that they did not make any fog signal, but contended that it was not required by law. The argument is:

"The preamble of the Inland Rules (U. S. Comp. St. 1901, p. 2876)—which are the rules applicable to this case—provides that 'the following regulations * * * shall be followed by all vessels navigating all harbors, rivers, and inland waters of the United States,' etc.

The Preliminary Definitions (page 2876) of the act say: 'The word "Steam-vessel" shall include any vessel propelled by machinery.'

Under Sound Signals for Fog, and so forth (page 2880), is found: 'Art. 15, 2. A steam-vessel shall be provided with * * * an efficient bell.'

'A sailing-vessel of twenty tons gross tonnage or upward shall be provided with a similar * * * bell.'

'In fog, mist, * * * whether by day or night, the signals described in this article shall be used as follows, namely:'

'(d) A vessel when at anchor shall, at intervals, of not more than one minute, ring the bell rapidly for about five seconds.'

'(f) All rafts or other water craft, not herein provided for, navigating by hand power, horse power, or by the current of the river, shall sound a blast of the fog-horn, or equivalent signal, at intervals of not more than one minute.'

The above are, we submit, all of the provisions of the Inland Rules applicable upon this particular question.

(a) The Statute having so specifically provided, in article 15 (2), that a steam vessel, * * * and a sailing vessel of twenty tons gross tonnage or upward shall be provided with a bell, it goes without saying that the Statute intends that vessels not falling within the two classes so designated shall not be provided with a bell.

(b) Accordingly, when, in (d), the Statute provides that 'a vessel when at anchor, shall * * * ring the bell,' it can only mean that such vessels as the Statute has required to be provided with a bell shall ring it.

Other vessels, falling within the classes mentioned in (f) 'shall sound a blast of the fog-horn, or equivalent signal.'

(c) It is entirely clear that nothing in the Statute requires a Steam Dredge, or Scow,—neither of them having any motive power, * * * or not 'navigating' at all, or not even navigating by any of the means specified in (f),—to be provided with a bell.

(d) It is, also, plain, as matter of construction of the Statute in which the Inland Rules are contained, that none of the provisions (cited above), can be said to require such a Steam Dredge, or Scow, to ring a bell, or give any other signal in fog.

It is hardly worthy of remark that the consideration, urged at argument, to the effect that the fact that Dredge No. 6 had a bell, has any tendency to

show her obligation to ring it, in fog, is wholly wide of the mark. There are, obviously, many other uses for a bell on a Dredge.

(e) It is submitted that the present is an instance,—(of which there are several),—of clear, possibly unintentional omission, and oversight in the drawing of the Statute.

(f) Again, it is exceedingly questionable whether,—apart from the considerations urged above,—the expression 'A vessel when at anchor,' in (d), could be reasonably held applicable to a Dredge held, and fixed, rigidly, to the bottom by spuds, as was Dredge No. 6, on the morning of the collision."

Notwithstanding the argument, I think it is clear that the libellant's vessels here were required to use the ordinary precautions to warn other vessels of their presence. It was distinctly held by Judge Dodge —In re Eastern Dredging Co. (D. C.) 138 Fed. 942—that a scow is a vessel to be dealt with as such by persons concerned with maritime affairs. Dredges have, I think, been uniformly treated as vessels subject to the ordinary rules relating to navigation—The City of Birmingham, 138 Fed. 555, 71 C. C. A. 115, for example—and it would be anomalous if they could occupy navigable waters in a fog without giving other vessels, which were justified in navigating there, warning of their presence. That they were considered as being within a rule requiring the ringing of a bell is shown to some extent by the fact that this dredge had a bell. It is urged that the bell may have been intended for other purposes. That may be, but it was not proved to have been so, and it is more than probable that it was supplied to be used for fog conditions. Whether it was so intended is immaterial, however, because it was the duty of a dredge to be supplied with a bell and to ring it at least every minute. The master of the dredge testified that it was customary to use the bell in a fog.

It is urged, however, that the dredge was making the other sounds mentioned above.

Assuming that these sounds were made, it is not at all clear that any reliance can be placed upon the estimate of time. That the sounds were not heard in time to be of any use to the Kennebec, though she had a good lookout, is reasonably certain. It is also established that the Kennebec was continually sounding fog signals which were not heard on the dredge until immediately before the collision and then nothing was done to warn the Kennebec.

I think, therefore, that the dredge and scow also committed faults contributory to the collision.

There will be a decree for the libellant for half damages, with an order of reference.