## LEA RIVER LINES, Inc. v. THE VIRGINIA.

## CUMBERLAND RIVER SAND CO. v. LEA RIVER LINES et al.
## THE CRS NO. 16.
## THE FROG.
### No. 10.

United States District Court
W. D. Kentucky, at Louisville.

Feb. 15, 1949.

Libel by Lea River Lines, Inc., owner of the Motor Vessel Frog, against the Motor Vessel Virginia, her tackle, etc., claimed by the Cumberland River Sand Company for damages to a barge and cargo wherein the Cumberland River Sand Company, as owner of Barge CRS No. 16, filed a cross-libel against Lea River Lines, in personam, and the Motor Vessel Frog in rem.

Decree for libelant.

Edward B. Hayes and Lord Bissell & Kadyk, Chicago, Ill., William Mellor, Louisville, Ky., for libelant.

Thomas J. Wood and Doolan, Helm, Stites & Wood, Louisville, Ky., for the M/V Virginia and Cumberland River Sand Co.

SHELBOURNE, Chief Judge.

On the morning of December 29th, 1942, about 5:20 o'clock, a collision occurred between the tows of two motor vessels, the Frog and Virginia, in the lower Mississippi River at or about Mile 811. The Virginia and her tow were upbound. Her tow consisted of four barges laden with oil, which was being pushed by the Virginia. The barges were arranged in tandem fashion. The combined length of the tow was 734 feet, which with the length of the Virginia—111 feet—made a flotilla 845 feet long.

The Frog, a smaller vessel, 60 feet in length, was pushing a tow of four barges, made up in two tiers of two barges each. The stern barges were 220 feet and the forward barges 240 feet in length, making the length of the Frog and her tow 520 feet.

June 22, 1944, the libelant Lea River Lines, owner of the Frog filed this libel, seeking to recover $25,000, alleged damage to the barge NBC 540, the aft barge on the port side of the tow, which sum included the loss of cargo and loss of use of the barge and delay of the flotilla, claiming that the damage was due solely to the fault and negligence on the part of those in charge of the Virginia.

It was alleged in the libel that the Virginia was in charge of incompetent persons, who failed to keep a lookout and had failed to give and answer whistle signals from

the Frog and otherwise been negligent in the handling of the boat and tow immediately prior to and at the time of the accident.

September 15, 1944, the respondent Cumberland River Sand Company, owner of the Virginia, filed its answer denying any fault or negligence on the part of those in charge of the Virginia, and affirmatively plead fault and negligence on the part of those in charge of the Frog, contending that the Frog also was in charge of incompetent persons, who failed to keep and maintain a proper lookout and failed to sound proper signals and warnings and failed to stop and reverse her engines and check her headway, when an agreement for passing had not been made with the Virginia, and otherwise had been negligently maneuvered and handled.

The respondent filed its cross-libel in personam against the Lea River Lines and in rem against the Virginia, seeking damages to oil tank barge CRS No. 16, the lead barge in the tow of the Virginia.

The case was tried May 28th and 29th, 1947, and was submitted on briefs filed in August 1948.

The place of the collision was between Fancy Point, designated on the map at Mile 812.3 and Irvine Light 810.3.

The Court makes the following—

#### Findings of Fact.

1. On the morning of December 29, 1942, the motor vessel Frog, with her tow above described, was downbound and the motor vessel Virginia, with her tow above described, was proceeding upstream. The tows of the vessels came in collision between Fancy Point Light and Irvine Light, at a point where the course of the river is generally straight from approximately Mile 809 down past Mile 814, though the general course of the Mississippi above and below this particular stretch is circuitous, as will be better shown by a map of the river in that territory.

Both vessels were equipped with lights, illuminated by power generated by the vessel. On the head of the tow of the Frog, there were lights, green to starboard and red to port—illuminated by power from storage batteries.

The Frog was 24 feet wide and the Virginia 25.3 wide.

Each of the two barges in the stern of the tow of the Frog was 40 feet wide and the forward barges were 45 feet wide. The boat was so made up at the rear of the tow as to be in the center of the combined width of the two stern barges.

The barges in the tow of the Virginia were of different lengths and widths. From forward to stern the four barges in the tow of the Virginia were 195 x 35, 180 x 35, 179 x 39 and 240 x 45.

Both the Frog and the Virginia were equipped with pilot house controls, that is, a pilot with the controls at hand in the pilot house can direct the course of the vessel without signaling the engineer. Both vessels were equipped with a pilot house, constructed largely of windows, so as to provide adequate lookout to the pilot.

While there is some slight contradiction on the part of some of the witnesses, the preponderance of the evidence is, and the Court finds, that the weather was fair, though cold, and visibility good, with regard to rain, mist, fog, or other factors which interfere with clear visibility. It was not yet daylight at the time the collision occurred and a moonlit night.

The Frog was being handled by a pilot, Elmer Miller, who had assumed charge at midnight and whose watch lasted until six o'clock. The Master of the Frog, Captain Sherman Waxler, had been in charge as pilot, up until midnight and was aroused from his sleep in the Captain's quarters, by danger signals given by the Frog, prior to the collision.

There was also on the Frog, a deckhand, Henry Landry, an engineer O. M. Grugett, deckhand, James E. Johnson, and John Callahan, engineer. Henry Landry, the deckhand, was in the galley of the Frog and had prepared, or was preparing, coffee. His next watch was from 6 A.M. to 12 M. O. M. Grugett was the engineer, whose watch began at 6 A.M. John Callahan, the engineer, was on duty at the time of the accident, and was not produced, nor was

Jos. E. Johnson, the deckhand, on duty at the time of, and since midnight, before the collision.

Only one member of the crew of thirteen of the Virginia testified. That was the pilot, Captain Finley Williams.

The Captain of the Frog, Captain Miller's attention was attracted to the presence of a vessel below him by a searchlight being played and in a short space of time, he discovered the vessel, which turned out to be the Virginia. He could clearly see her navigation lights and estimated that she was then more than three miles below him.

At this point, the Frog was about Mile 809 or just below Bayou Sarah Light and was proceeding downstream about in the center of the channel (the sailing line). He thus proceeded on the sailing line, which was much nearer the left descending bank, until he had given two-one blast signals with the whistle of the Frog, thereby signifying his intention to effect a port to port passing. The second one-blast signal was given when the heads of the tows were about three-fourths of a mile apart. At that time, the Frog was proceeding at a speed of about seven miles per hour over the ground. He maneuvered the Frog to the right-hand side of the channel, which is shown to be from 350 to 400 yards wide at this point, but lies over nearer to the left descending bank.

The red navigation light of the Virginia showed to Captain Miller, but after he had proceeded some 200 yards, after giving the second signal, the green navigation light on the starboard side of the Virginia also came in view. This indicated to the pilot that the Virginia was proceeding straight toward the Frog. At this time, the heads of the tows were some 400 yards apart.

Captain Miller then reversed his engines and blew a danger signal. He also steered the stern hard to his starboard, in order to bring the head of his tow to port. He blew either two or three danger signals, none of which was answered by the Virginia and the pilot and Captain Waxler, who came out on deck when the first danger signal was blown, the Engineer Grugett and the deckhand Landry, all say that the Virginia neither checked her speed, stopped her engines until after the collision, nor veered away from its course.

Captain Waxler stated at the time of the collision, the Frog was an estimated 500 yards from the left descending shore. Landry stated they "were a long way out in the river."

The only testimony on behalf of the Virginia is by the pilot Captain Finley Williams. His testimony is that he was "shaping the shore" along the left descending bank, proceeding upstream approximately 2-3/4 miles per hour. He testified that he was unable to steer by the navigation lights and for that reason was "shaping the shore", and in order to do that it was necessary for him to hold the head of his tow to his port. This accounts for the green light on the starboard side of the Virginia coming into view of the Frog.

It is unnecessary to determine whether Captain Williams was tuning the radio, drinking coffee or otherwise engaged, but it is clear from the evidence that he was not maintaining a lookout. It was his duty to maintain a lookout for the safety of his own flotilla as well as for the safety of other boats on the river. It was his duty to give the first signal for passing boats which he met proceeding downstream. At no time did he give any signal. At no time did he answer any signal given by the Frog. He testified that the heads of the two tows were within 400 feet of each other when he, for the first time, discovered the Frog.

The collision occurred when the Frog was on the western side of the center of the channel. In the collision, the port bow of the lead barge of the Virginia struck the port side of the aft barge in the tow of the Frog about 30 feet back from its bow, the barge in the tow of the Virginia riding the barge in the tow of the Frog, scraping and destroying the expansion domes on the deck, but finally sliding off.

The Virginia was maintaining no lookout and negligently failed to answer the

light and whistle signals from the Frog. This negligence was the sole cause of the accident.

While there is no testimony that the Frog was maintaining a lookout, other than the pilot Miller, this lookout had proven effective and the presence of the Virginia was discovered and signals given in accordance with the Navigation and Pilot Rules to effect a safe passage.

Those in charge of the Frog were, therefore, not negligent and did not fail to maintain an adequate lookout and did not fail to reverse her engines, and blow a danger signal when the danger of a collision became reasonably apparent to the pilot.

## Conclusions of Law.

I. This Court has jurisdiction of the parties and the subject matter.

II. While there is a conflict in the testimony in this case, the preponderance of the evidence support the libelant. The Smith Terry No. 1, 5 Cir., 34 F.2d 570; The Richmond, 275 F. 750, affirmed 4 Cir., 294 F. 90.

III. The evidence shows that the vessels were approaching from opposite directions and were therefore governed by the rules prevailing for the passing of vessels in inland waters. 33 U.S.Code 343, Rule 18. The pilot in charge of the Virginia violated this rule in not giving a passing signal and failing to answer or respond to the port to port passing signal given by the Frog, Chester A. Poling et al. v. United States, 2 Cir., 55 F.2d 921; The Jensen No. 1 D. C., 43 F.Supp. 288, affirmed, 2 Cir., 130 F.2d 195.

IV. The Virginia was at fault in changing her course and proceeding across or into the path of the Frog, which latter vessel was showing her lights and had given a signal to pass port to port. The John J. Timmins, 2 Cir., 233 F. 748; The Johnson, 76 U.S. 146, 19 L.Ed. 610; The Californie, 2 Cir., 250 F. 790, certiorari denied 247 U.S. 515, 38 S.Ct. 580, 62 L.Ed. 1244. See also The Allentown, D.C.,

12 F.Supp. 568, wherein the Court held that a vessel was solely at fault in changing its course, whereas to have continued without such change would have avoided collision.

V. In the case of The Voco, D.C., 57 F.Supp. 531, 537, the Court, discussing the necessity of a lookout said—

"It is undisputed that there was no lookout on the bow of the 'Gypsum Prince' at any time after the pilot came on board. This was a serious fault which undoubtedly contributed to the collision. (Citing Cases.) It is no answer that those on the bridge were in as good a position to see and hear as a man stationed forward."

It is therefore apparent that the failure of the Virginia to post a lookout or to maintain a lookout, in addition to that of the pilot, is the prime cause of the collision. See also Gulf Oil v. Socony, 2 Cir., 162 F.2d 869; The Ariadne, 80 U.S. 475, 20 L.Ed. 542; The Cyrene, 4 Cir., 85 F.2d 935.

The culpability for the failure to post a lookout on the Virginia is accentuated, rather than excused, by the pilot's unsatisfactory testimony that the visibility was bad by reason of the glare of the moon on the river.

VI. The failure of the Virginia to stop and reverse her engines, when the Frog sounded the danger signal, can only be explained by the absence from the pilot house of Captain Williams. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126.

## Conclusion

It is my conclusion that libelant is entitled to recover the damages incurred to the flotilla of the Frog and that such damages resulted directly and solely from negligence on the part of the Virginia and her crew.

Such damages will be measured in a hearing before a Commissioner to be appointed, or before the Court, in accordance with the Rules of Admiralty.