PANAMA TRANSPORT CO. v. UNITED STATES.

UNITED STATES v. THE LIVINGSTON ROE et al.

THE S. S. LIVINGSTON ROE.

United States District Court
S. D. New York.
Dec. 20, 1951.

Kirlin, Campbell & Keating, New York City, Edwin S. Murphy, Raymond T. Greene, New York City, of counsel, for Libelant Panama Transport Co.

Myles J. Lane, U. S. Atty., New York City, Leo J. Curren, Charles A. Blocher, New York City, of counsel, for United States of America.

GODDARD, District Judge.

Libel by Panama Transport Company, as owner and operator of the S.S. Livingston Roe and as bailee of cargo against the United States of America, as owner and operator of the S.S. Monterey, and cross-libel by the United States of America against the Livingston Roe and Panama Transport Company, as owner of and operator of the Livingston Roe. Each seeks to recover for the damage sustained as a result of a collision between the Monterey and the Livingston Roe in the lower Mississippi River on February 26, 1946, at 8:51 P.M.

The Monterey is a 3 cylinder steam turbine army transport 385 feet long and 31½ feet in depth with a 57½ foot beam. The Livingston Roe is a 4 cylinder quadruple expansion engine Panamanian tanker 462 feet, 10 inches long and 37 feet in depth with a 60 foot beam and a draft of 22 feet, 11 inches forward and 27 feet, 9 inches aft.

Both vessels were proceeding down the river bound for sea. The tide was ebb with a current of about 5 miles an hour running down stream.

The collision occurred about diagonally across the river from Wilder Flats Light some 100 feet off the west bank. The river in this vicinity is upwards of three quarters of a mile wide and runs from northwest to southeast.

A little after 8 P.M. when the Livingston Roe was several miles above the Wilder Flats Light, she ran into a fog. She reduced her speed and sounded fog signals. After a short run, she emerged from the fog and increased her speed until about 8:36 P.M. when she again encountered a dense fog, reduced speed and sounded the proper fog whistles. The master and pilot of the Livingston Roe testified that visibility shortly after entering the fog was 100, or less than 150 feet.

On the bridge of the Livingston Roe with the master was the river pilot, the third officer, and a seaman at the steering wheel. There was a seaman on the bow as lookout. About a minute after entering the fog, namely, at 8:37 P.M., those on the Livingston Roe heard whistle signals from a vessel apparently below them and northbound. Her master and pilot decided to anchor and turned the Livingston Roe to the right toward the west bank of the river and sounded the appropriate signals. She made about an 180° turn so that she headed up river into the current. At 8:47 P.M. she dropped both anchors with 45 fathoms of chain, immediately commenced sounding the fog signal by ringing her anchor bell, turned off her running lights and switched on her anchor lights. She was so anchored for about four minutes before the collision.

At 8:50½ P.M., Monterey's mast light was seen a short distance away bearing down on the Livingston Roe. The Livingston Roe sounded the prescribed danger signal. Her master ordered hard left rudder and engines full ahead in an effort to get as near the bank as possible, and to save her being out adrift by having her anchor chains carried away. At 8:51, the Monterey, swinging to her right, collided with the Livingston Roe about 100 feet off the west bank—the stem of the Monterey striking the starboard bow of the Livingston

Roe at an angle of approximately 10°. Considerable damage resulted.

The Monterey, after passing through intermittent fog at her full engine speed of about 14 knots through the water or, with the aid of the current, 19 knots over the ground, had been proceeding down the river in about midstream 8 or 10 minutes behind the Livingston Roe. On the bridge with the pilot was the master, a licensed officer and a junior officer. A lookout was stationed in the bow.

About 8:45 P.M., while proceeding at this same speed, she encountered the fog bank previously referred to and at the same time heard the fog whistle of a vessel, which later proved to be the Livingston Roe, further down the river. The Monterey then commenced sounding her own fog whistles and reduced her engine revolutions to half ahead. At 8:46½ P.M., her engine revolutions were reduced to slow ahead and her rudder was put to the right, altering her course to the south or diagonally toward the west bank of the river. At 8:49½ P.M., the Monterey put her engines full astern and returned her rudder to center. A minute and a half later she struck the anchored Livingston Roe. During the entire period between the time the Monterey entered the fog and the collision, the Monterey continued to hear the Livingston Roe's fog whistle.

The master and pilot of the Monterey testified that, when they first saw the Livingston Roe flash on her anchor lights, the visibility was 1500 feet. I think these estimates are much too high, but as their testimony was submitted by deposition, there was no opportunity to question them in court.

■ At the time of this collision, February 26, 1946, navigation on the Mississippi River in the area from the delta to the Huey Long Bridge above New Orleans was governed by "Pilot Rules For the Rivers whose waters Flow into the Gulf of Mexico and Their Tributaries and The Red River of The North", commonly known and referred to as the Western River Rules, 46 U.S.C.A. § 381.

Rule XIII of these rules provides as follows: "Every steam vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rainstorms, or other causes, go at moderate speed. A steam vessel hearing, apparently not more than four points from right ahead, the fog signal of another vessel shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other."

Under the conditions then existing, the Monterey was not proceeding at a "moderate speed" inasmuch as the speed she was going was in excess of the speed which would permit her to stop within the distance she could see another vessel in the fog. The Nacoochee, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; The Umbria, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053. Nor did she navigate with caution.

Respondent contends that the Monterey had to proceed at high speed to maintain steerageway in the current. However, there is no evidence to support that contention. Nor would that be a valid excuse for her proceeding at such a speed in a dense fog that she endangered other vessels.

When she encountered this fog bank, the Monterey was making "by engine, about fourteen" knots, according to her master. With the current of the river, the Monterey was thus making about nineteen knots over the ground despite the fact that she had been passing through intermittent dense fog. The thick fog bank could be plainly seen before the Monterey entered it. Yet nothing was done to reduce her speed until she had reached the fog and had heard the fog signals of the Livingston Roe.

Then, although the pilot aboard the Monterey testified that he could not see the buoy lights in the river and that they did not know where the vessel was that was sounding the fog whistles [they did know it was in the vicinity], those in charge of the Monterey did nothing more to reduce the speed of the Monterey than to reduce her engine speed; at 8:45 P.M., from full ahead to half ahead and at 8:46½ P.M., from half ahead to slow ahead.

However, this reduction of engine revolutions would have little immediate effect

upon the speed of a vessel with the headway of the Monterey in a five knot current. Even if the engines had been completely stopped so that there was no forward propulsion by the engines through the water, the speed of the Monterey would not have been greatly reduced within a safe distance when the master and pilot knew there was another vessel in the immediate vicinity that they could not see.

According to the testimony of the master and the pilot of the Monterey, they first sighted the Livingston Roe about 1500 feet away at 8:49½ P.M. Although the Monterey immediately put her engines full astern and returned her rudder to center, the collision occurred at 8:51 P.M. In view of all the evidence, I think that their estimates of 1500 feet are excessive, but whatever the distance and speed, the speed of the Monterey was such that she was unable to stop within the entire distance between her and the Livingston Roe. This excessive speed was a direct cause of the collision—without it, the collision would not have occurred. The Monterey was therefore at fault. Silver Line v. United States, 9 Cir., 94 F.2d 754.

█ Indeed, even if an attempt to reduce the speed to bare steerageway had been made, if the Monterey could not maintain steerageway without too great a speed in a thick fog when she knew another [unseen] vessel was near at hand, she should have anchored. The Pennsylvania, 19 Wall. 125, 134, 22 L.Ed. 148; The H. F. Dimock, 1 Cir., 77 F. 226; see also, Lie v. San Francisco & Portland Steamship Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726; Chesapeake & Delaware Steamboat Co. v. Tug Pennsylvania, 1934 A.M.C. 569.

█ The Monterey also was at fault when, upon hearing the fog signals from the Livingston Roe and not knowing the latter's position, she changed her course by putting her rudder right. This turned her toward the Livingston Roe. When the Livingston Roe was sighted, the Monterey was unable to stop before the collision because of her excessive speed. The Monterey should not have altered her course but should have stopped and ascertained the position of the Livingston Roe when the fog signals of the Livingston Roe were heard. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Chinook-Dagmar Salen, 1951 A.M.C. 1253.

█ I do not think that those in charge of the Livingston Roe's navigation acted inadvisedly or contributed to the happening of the collision by anchoring. They were confronted with a situation where, in order to control their vessel in the strong current, it would be necessary for her to proceed at such speed that she could not be brought to a stop within the distance within which another vessel ahead could have been seen in the fog. They therefore anchored in what was a natural place to anchor and has since been officially designated an "Anchorage Area".

Upon dropping her anchors, she immediately complied with the rules by extinguishing her navigation lights, switching on her anchor lights, sounding fog signals by ringing her anchor bell.

The Livingston Roe is not to be condemned for starting her engines ahead and putting her rudder hard left in an effort to escape the on-coming Monterey. Even an anchored vessel may, and on occasion should, use her engines in an attempt to avoid being run into.

The anchored Livingston Roe was not a cause of the collision. The excessive speed of the Monterey in the fog and her change of course after hearing the Livingston Roe's fog signal without knowing the position of the Livingston Roe, are alone sufficient to account for the collision. Usually, if an anchored vessel is run into by a moving vessel, it is the fault of the moving vessel.

█ When one vessel is grossly at fault, that vessel will be held solely at fault unless evidence establishing the fault of the other vessel is clear and indisputable. The City of New York, supra; P. Dougherty Co. v. The G. M. McAllister, 2 Cir., 159 F.2d 486. There was no evidence establishing fault on the part of the Livingston Roe.

The libelant Panama Transport Company may have an interlocutory decree against

the United States with reference to a Commissioner to ascertain the damages. The cross-libel of the United States is dismissed.