THE PURE OIL COMPANY, a Corporation, Libelant,

v.

THE VESSEL M/V PENNSYLVANIA, its engines, tackle, apparel, etc., and Union Barge Line Corporation, a Corporation, Respondent.

UNION BARGE LINE CORPORATION, a Pennsylvania Corporation, as owner of THE Barges UBL-332, UBL-334, UBL-341 and UBL-345, Cross-Libelant,

v.

THE M/V R. H. McELROY, her engine, tackle, apparel, etc., and The Pure Oil Company, a Corporation, Cross-Respondent.

No. 27.

United States District Court, W. D. Kentucky, at Louisville.

Sept. 16, 1954.

Edward B. Hayes and Lord, Bissell & Kadyk, Chicago, Ill., Chas. I. Dawson and Bullitt, Dawson & Tarrant, Louisville, Ky., for libelant and cross-respondent.

T. K. Helm, Thomas J. Wood and Stites, Wood, Helm & Taylor, Louisville, Ky., for libelee and cross-libelant.

SHELBOURNE, Chief Judge.

This suit in Admiralty was instituted March 12, 1952, by the Pure Oil Company, a corporation, owner of the Motor Vessel McElroy, by the filing of a libel in rem against the Motor Vessel Pennsylvania, to recover damages to libelant's barges in the tow of the McElroy when the tow of that vessel came in collision with the tow of the Pennsylvania in the Ohio River at or near Point Pleasant, West Virginia in the early hours of the morning of October 15, 1951.

The Union Barge Line Corporation filed its answer and cross-libel against the McElroy seeking a recovery for damages to cross-libelant's barges in the tow of the Pennsylvania.

The case was tried to the Court February 19 and 20, 1953 solely on the issue of liability under the usual stipulation that the damages, if any, be ascertained by a Commissioner in accordance with the Court's determination of liability.

Due to the illness of Counsel, briefs were not filed until March 10, 1954.

The Court makes the following—

### Findings of Fact.

1. The town of Point Pleasant, West Virginia, lies on the left descending bank of the Ohio River at which town the river is traversed by two parallel bridges located, according to a Navigation Chart introduced in the evidence, 528 feet apart. The upstream bridge is a railway crossing and that downstream is a highway vehicular bridge. Both extend from West Virginia to Ohio.

The sailing line at the two bridges is near the Ohio shore, extending in a long diagonal from the West Virginia shore approximately one and one-half miles above the railway bridge about opposite the Marine Ways and Plant of the Marietta Manufacturing Company.

The channel span of the railway bridge is 400 feet wide. The span of the highway bridge is 675 feet. Each span is marked, in aid of navigation of the Draws, by a green light in the center suspended from the steelwork of the bridge and by red lights on the piers at either side of the span.

2. The McElroy was up-bound, pushing a tow of four loaded oil barges, each 240 feet in length, made up two and two. The McElroy was 118 feet in length and 45 feet across her beam.

3. The Pennsylvania was bound down river, pushing a large tow of twenty barges—ten loaded and ten empties. Captain Reece Loyd, Master and Pilot of the vessel, described the tow as made up having a length of 935 feet which with the length of the boat of 166 feet, gave the flotilla an aggregate length of 1,101 feet. He described the make-up of the barges in the tow thus; "We had on the head of the tow nine empties, and then of course as you go back through the tow, we had nine loads. * * * The empties were three wide across the head, plus an additional barge which was more or less hanging on our starboard side * * * The nine loads were made up, that is, they were eight standard loads and one large regulation tank barge. We had the standard loads made up, four wide—two four's in other words. Then the large regulation tank barge on ahead of those and then with the empties made up around this one tank load."

4. The McElroy went into the Kanawha River to Stone's Landing to pick up a boiler barge. The mouth of the Kanawha is approximately one-half mile below the lower or highway bridge at Point Pleasant and it is on the left descending bank of the Ohio. Stone's Landing is two-tenths of a mile up the Kanawha from its mouth.

The McElroy went into Stone's Landing and picked up the Boiler barge upon which there was a watchman, and with this barge attached to the fore part of the tow on the starboard side, the McElroy sounded three long blasts of its whistle and backed out of the Kanawha into the Ohio and proceeded up stream again.

The stern of the Boiler barge was then forward and it was necessary to "top this barge around". This was accomplished by the Mate and two deckhands with the aid of hand flashlights and the search light of the McElroy, which was operated by the pilot from the pilot house. The stern end of the boiler barge in the tow was held fast and the front end (as it then was fastened to the tow) was released so that the forward motion of the flotilla caused the boiler barge to turn and it was then made fast again to the starboard side of the tow, with its bow ten or fifteen feet back from the head of the original tow.

A green signal light was placed on the starboard side of the bow of the boiler barge. There was an amber signal light on the center of the bow of the tow and a red light on the port of the forward barge.

5. The McElroy had on the head of the tow a teletalk by which a member of the crew or lookout could communicate with the pilot and, which picks up sounds of wave wash of nearby vessels. The Pennsylvania was equipped also with a teletalk and both vessels were equipped with radar. Each pilot was able, by the equipment of his boat, to communicate by radio telephone with the shore and with other river craft and with each other.

6. When the mate and two deckhands completed the topping around of the boiler barge on the McElroy, the head of that tow was about 100 yards below the lower of the two bridges. The Mate came immediately to the pilot house and was advised that the McElroy would tie up on the Ohio shore as soon as she passed under the two bridges. The two deckhands had also left the tow so that the McElroy was without any lookout on her tow.

When the mate came to the pilot house, the fog then seemed to the pilot "a solid bank" at and above the bridges.

As the head of the tow passed under the first bridge and into the fog bank, the pilot blew three short blasts (the regulation fog signal) of the whistle. When the McElroy passed under the first or lower bridge her pilot could see in the fog a distance of about fifty feet and the fog was much thicker as she reached the second or upper bridge.

From the mouth of the Kanawha to the lower bridge the McElroy ran at from slow to half speed and when the head of her tow reached the fog bank at the lower bridge, she came at full speed ahead so that, as explained by her pilot, he would have better steerage control and could get through the bridges before the fog shut out the channel lights on the bridges.

When the stern of the McElroy had cleared the upper bridge, the engines were stopped and placed in full reverse. The flotilla continued forward about 250 feet when the collision occurred.

7. The Pennsylvania passed the Keeley more than nine miles up-river from Point Pleasant. It was then very foggy, so much so that the Keeley tied up immediately after the passing and remained tied up some eight and one-half miles above Point Pleasant until after the collision.

The Pennsylvania passed Point Pleasant going at either slow-bell or floating. Above Point Pleasant and again opposite the Marietta Marine Ways, it blew fog signals which were noticed by Charles Harman, a guard, and Wayne Love, a watchman, both employees of the Marietta Manufacturing Company.

Gene Juniper, a deckhand, on the Pennsylvania, lived with his family in a house-trailer about two blocks below the Marine Ways at Point Pleasant. About twelve hours before the boat was scheduled to pass Point Pleasant he had been permitted to leave the boat to visit with his family and to be picked up by the Pennsylvania when she came into Stone's Landing on the Kanawha to pick up mail. Juniper heard the Pennsylvania blow a fog signal before it passed his trailer. When he heard this signal he and his wife got into his automobile and drove to Stone's Landing. They arrived there before the McElroy came into the Kanawha and witnessed her arrival and departure. Juniper heard numerous fog signals blown by the Pennsylvania before he heard the crash of the collision.

The pilot of the Pennsylvania blew two fog signals as he was aligning his boat and tow with the signal lights on the upper or railway bridge to pass through the draw.

He had no response to any signal but through the teletalk the mate out on the head of the tow told him there was a boat meeting them. The engines were immediately set full astern and the stern of the boat was steered toward the Ohio

shore to avoid as much as possible a head-to-head collision.

8. Besides the mate a deckhand was on the head of the tow of the Pennsylvania when she was maneuvering for the proper alignment to pass through the bridges. At the suggestion of the mate, he ran when the collision became imminent.

The Pennsylvania maintained a proper lookout.

### Conclusions of Law.

I. From the foregoing statement of the salient facts adduced from the evidence in this case it seems a fair conclusion that the McElroy was at fault—negligent in failing to maintain a lookout on the bow of its tow—failure to give adequate signal as it proceeded into the solid bank of fog when it undertook to pass under the bridges at full speed and operating a flotilla at full speed under the dense fog conditions which prevailed.

Rules 16 and 26 of the Pilot Rules for Western Rivers are as follows—

Rule 16, 33 U.S.C.A. § 341. "Every steam vessel shall, in fog, mist, falling snow, heavy rainstorms, or any other condition similarly restricting visibility, whether by day or night, go at a moderate speed. A steam vessel hearing, apparently forward of her beam, the fog signal of another vessel shall at once reduce her speed to bare steerageway, and navigate with caution until the vessels shall have passed each other."

Rule 26, supra, § 351, Title 33 U.S.C.A., is as follows—

"Nothing in sections 302–352 of this title shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

"When one vessel is grossly at fault, that vessel will be held solely at fault unless evidence establishing the fault of the other vessel is clear and indisputable."

Panama Transport Company v. United States, D.C., 102 F.Supp. 958, 961.

II. It is undisputed by counsel for libelant that the McElroy had no lookout on the bow of the tow and that no member of the crew was on the tow after the "topping around" of the boiler barge had been finished and this was accomplished when the McElroy was about half way from the mouth of the Kanawha to the lower or highway bridge.

In The Manchioneal, 2 Cir., 243 F. 801, 805, the Court said—

"* * * by the overwhelming weight of authority it is settled that the proper place for a lookout is, under ordinary circumstances—on the bow."

In The Choctaw, 270 F. 114, 118, the Court of Appeals of this Circuit quoted with approval the above excerpt from The Manchioneal case and said further—

"There is grave doubt whether the absence of a properly posted lookout ought ever to be held inconsequential in a fog case. There is too much inherent uncertainty as to what he might have seen and heard if he had been in the right place."

In The Choctaw, supra, it was urged that a lookout 200 feet back from the bow of the tow could see as well as one on the head of the tow, and our Court said—

"* * * sometimes he could, and sometimes he could not * * *."

The Court further held that a lookout on the bow of the tow might be able to hear noises which would indicate the presence of vessels approaching under conditions where the eyes would not reflect such conditions. See also The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165; The W. H. Gilbert, 6 Cir., 232 F. 547; The Tillicum, D.C., 217 F. 976 and Lea River Lines, Inc., v. The Virginia, D.C.W.D.Ky., 85 F.Supp. 89.

III. Rule 16, quoted above, 33 U.S.C.A. § 341, required that the McEl-

roy proceed at a moderate speed because of the fog. Disregarding this rule when the head of its tow was entering into the bank of the fog where the vision of the pilot extended less than the length of the tow and increasing his speed to the maximum capacity is negligent. He undertakes to justify this by saying that he desired to pass through the draws of the two bridges as quickly as possible, thereby to avoid the possibility of colliding with other vessels. Such conduct is not justified by the requirements of the Rule. He could not bring the McElroy to a stop within the vision had ahead and increasing the maximum speed without the presence of a lookout on the head of the tow does not meet the requirements of good piloting. The John F. Lewis, D. C., 51 F.2d 274, 275; The Ernest H. Meyer, 9 Cir., 84 F.2d 496 and The Silver Palm, 9 Cir., 94 F.2d 754.

IV. The McElroy was remiss in the failure of her pilot to sound adequate signals. For almost the entire distance from the mouth of the Kanawha River to the lower bridge, the pilot could see the fog descending in a solid bank down river and it was his duty to give adequate signals for the protection of vessels hidden in the fog, although the McElroy at that time had not passed into the fog. The Papoose, 2 Cir., 85 F.2d 54.

It is reasonable to presume that had the pilot not been engaged in operating the light so as to enable the mate and deckhands to "top the boiler barge" this precaution would have been observed.

Counsel for libelant earnestly insists that the presence of the teletalk on the McElroy excuses its failure to have a member of its crew posted as a lookout on the head of the tow. He argues that this technological improvement in navigation is sufficient to meet the requirements of the law with respect to a lookout. No case holding such is cited and this Court is unwilling to believe that the teletalk can be substituted for the eyes and ears of a human lookout.

Counsel for libelant further argues that the failure on the part of the pilot of the Pennsylvania to follow the McElroy from the mouth of the Kanawha to the point of collision in his radar was negligence. The McElroy was also equipped with a radar and while counsel talks about the Pennsylvania loitering next to the Ohio shore above the bridges, the evidence is that the Pennsylvania crossed the river from the Marietta Marine Ways at Point Pleasant to the Ohio shore, following the sailing line in the channel of the river.

The Court concludes that with the McElroy lies the fault of this collision and that the respondent and cross-libelant is entitled to recover damages incurred to its barges. Pursuant to the stipulation of counsel, the damages will be admeasured either by the Court or by a Commissioner, in the event the parties are unable to come to an agreement with respect to the damages. A decree in line with this conclusion will be tendered by counsel for respondent and cross-libelant upon notice to counsel for libelant.