**GULF STATES MARINE AND MINING COMPANY**

v.

**ARTHUR SMITH CORPORATION and THE Tug JOHN ARTHUR, her engines, tackle, etc.**

**No. 2533.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 15, 1957.

Thomas B. Wheeler, New Orleans, La., for libellant.

Phelps, Dunbar, Marks, Claverie & Sims, J. Barbee Winston, New Orleans, La., and Robert Eikel, Houston, Tex., for respondent.

CHRISTENBERRY, Chief Judge.

Gulf States Marine and Mining Company brought this action in admiralty against the Arthur-Smith Corporation and its tug John Arthur for damages sustained by Gulf States' tug, the Dawn, in a collision with the tow of the tug John Arthur in the Harvey Canal near New Orleans on February 4, 1954. By agreement of the parties, the sole issue of liability *vel non* was tried to the court, and the court, after considering the pleadings, the evidence and arguments of counsel, makes the

following findings of fact and conclusions of law with respect to that issue.

## Findings of Fact

### I

Gulf States Marine & Mining Company is a Texas corporation and was the owner and operator of the tug Dawn, a steel diesel tug of 600 horsepower, and two steel tank barges, the WGH-5 and WGH-6, which barges measured approximately 220 feet long by 48 feet in width and ten feet in depth.

### II

Arthur-Smith Corporation, also a Texas Corporation, was the owner and operator of the tug John Arthur, a steel diesel tug of approximately 400 horsepower and three steel tank barges, two of which were 190 feet long and the other of which was 175 feet long.

### III

On the morning of February 4, 1954, the tug Dawn and the two barges WGH-5 and WGH-6 were proceeding through the Harvey Canal toward the Harvey Locks. The barges were empty and had a freeboard of approximately 8½ feet. At a location some three miles west of Harvey Locks those aboard the tug Dawn rearranged their tow so that the two barges were made up abreast with the Dawn pushing on the stern of the starboardmost barge, the WGH-6. Thereafter, the tow crossed to its own right hand side of the Harvey Canal and proceeded toward the Harvey Locks at a speed of approximately one-half mile per hour holding to within 15 to 20 feet of its own right hand bank.

### IV

The Harvey Canal is approximately straight from the Harvey Locks to Five Mile Post west and measures approximately 375 feet between banks. According to regulations of the U. S. Army Corps of Engineers, tugs are allowed to make up their barges abreast to a width greater than 55 feet in an area commencing 2.75 miles west of the locks in order to expedite the movement of traffic through the locks. This was done by libellant's tug so that the width of the tow was the width of its two barges or 96 feet. Allowing 20 feet between the right hand side of the starboardmost barge and the right hand, or downriver side, of the Harvey Canal, libellant's tow was taking up 116 feet of a 375 feet wide canal, leaving approximately 259 feet on its port hand.

### V

There was a ground fog or haze on the Harvey Canal on the morning of the collision. The thickness and extent of the fog was variously described in the testimony, but the preponderance of evidence is that the fog was low and came up only to the deck of libellant's empty barges and to the top of the light standards on respondent's barges. The collision occurred at 7 a. m., during daylight, and the fog or haze was such that none of the traffic on the Canal was blowing fog signals.

### VI

Those aboard the tug Dawn sighted the tug John Arthur pushing three loaded barges and coming from the Harvey Locks when the flotillas were at least one half mile apart, and blew a one-blast signal for a port-to-port passing. The signal was promptly answered by the John Arthur. The barges in the tow of the tug John Arthur were loaded, with a draft of approximately eight feet. The barges were being pushed in approximately the center of the channel, made up ahead of the tug John Arthur.

### VII

At the time the passing signals were exchanged the Dawn had her mate and her tankerman stationed on her port barge as lookouts. The tankerman remained on the port barge until after the collision, but the mate moved over to the starboard barge just before the impact. It was admitted that the John Arthur did not have lookouts on her barges.

## VIII

After the exchange of passing signals the Dawn maintained her course and speed until the headlogs of the two tows were about 75 feet apart. At that time the master of the tug Dawn, who was at the wheel, realized that the John Arthur was on her own left hand side of the Canal and that a collision was imminent. The master of the Dawn immediately reversed his engines, which had a tendency to swing the head of his barges to starboard, but it is uncertain whether or not the head of the Dawn's tow actually moved to starboard prior to the actual impact.

## IX

Because of the fog, the master of the John Arthur, who was more than 550 feet behind the bow of his lead barge, was unable to see the entire length of his lead barge from the wheelhouse. He was able to see the wheelhouse of the tug Dawn above the fog but did not see the barges abreast of the Dawn and did not realize their presence.

## X

The John Arthur, which had been proceeding at a speed of approximately two to three miles per hour, continued without apparent reduction of speed. Shortly after the exchange of passing signals between the tugs Dawn and John Arthur, the latter exchanged passing signals for a starboard-to-starboard passing with the tug Independence which was proceeding on the opposite side of the canal from the tug Dawn. The tug John Arthur veered to port in the direction of the tug Dawn to effect its passing with the tug Independence.

## XI

The forward port corner of the lead barge of the tug John Arthur rammed up beneath the forward rake of the WGH–5 in tow of the tug Dawn, about 12 feet inboard of its forward port corner, causing damage only to the WGH–5. After the impact the John Arthur continued ahead and pushed the tug Dawn and her tow several hundred feet astern before those aboard the Dawn could come full ahead on her engine to keep the stern of the Dawn from running aground.

## XII

The collision occurred approximately 2½ miles west of Harvey Locks.

### Conclusions of Law

#### I

This court has jurisdiction over the subject matter of this action, and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. 1333.

#### II

The tug John Arthur and her tow were negligent in failing to station a lookout at the bow of the tow, more than 550 feet forward of the wheelhouse of the tug, when she entered fog which admittedly prevented the master from seeing the head of his tow. Pilot Rules of Inland Waters, Article 29, 33 U.S.C.A. § 221; Gulf Oil Company v. Socony, 2 Cir., 1947, 162 F.2d 869, 1947 A.M.C. 1031; Pure Oil Co. v. The Vessel M/V Pennsylvania (Union Barge Line Corp. v. The M/V R. H. McElroy), D.C.W.D.Ky.1955, 124 F.Supp. 121, 1955 A.M.C. 1116; C. J. Dick Towing Co. v. The Leo, D.C.S.D. Tex.1951, 98 F.Supp. 455, 1951 A.M.C. 1539.

#### III

The tug John Arthur and her tow were negligent in proceeding into a fog bank at an excessive rate of speed of 2 or more miles per hour when visibility was limited by ground fog, and she was unable to stop in one half of the forward distance. Pilot Rules for Inland Waters, Article 16, 33 U.S.C.A. § 192; The Umbria, 1897, 166 U.S. 404, 417, 17 S.Ct. 610, 41 L.Ed. 1053; Silver Lines, Ltd. v. U. S., 9 Cir., 1937, 94 F.2d 754, 1937 A. M.C. 1427; Eymard v. The Bonnie Ruth, D.C.E.D.La.1954, 120 F.Supp. 67, 1954 A.M.C. 1186.

#### IV

The tug John Arthur and her tow were negligent in failing to keep to their starboard side of the canal in a fog when

the master was able to see the wheel-house of a tug to his port but was unable to determine whether the tug had a tow, or in what manner the tow, if any, was arranged. Pilot Rules for Inland Waters, Article 25, 33 U.S.C.A. § 210.

### V

Accordingly, the collision resulted from the faults of the tug John Arthur and its crew, and libelant is entitled to an interlocutory decree for its damages resulting therefrom with interest from the date of the collision and costs.